[Civ. Nos. 2591, 2592. Third Appellate District.—January 16, 1924.]

LILLIAN MUSACHIA, Respondent, v. C. W. JONES et al., Appellants.

[1] NEGLIGENCE — AUTOMOBILE ACCIDENT — PERSONAL INJURIES—EMPLOYEE ON OWN TIME—LIABILITY OF EMPLOYER.—Where an employee, while on his own time and in pursuit of his own pleasure, takes the truck of the employer without permission so to do being asked of anyone, by anyone, or given by anyone, and,

---

Owner's liability for injury by automobile while being used by a servant for his own pleasure or business, note, 22 A. L. R. 1397.

while operating it upon and along a public road, runs into and injures another, the employer is not liable.

[2] ID.—TAKING AUTOMOBILE WITHOUT PERMISSION—DUTY TO RETURN.—Said employee having been seeking his own pleasure, and having taken the truck as a matter of his own convenience without permission of anyone, it was his legal duty to return the truck from the place from whence it had been taken; and the employer, upon learning of the taking of the truck without permission, by directing the employee to return the truck to the place from which it was taken without permission, did not render himself liable for any act of negligence in returning the truck by the person who had wrongfully taken it away.

[3] ID.—AUTOMOBILE NOT USED IN SERVICE OF OWNER—PRESUMPTION OF AGENCY—EVIDENCE.—In an action for damages for personal injuries as the result of being run into by an automobile driven by one other than the owner, when all the facts are laid before the court and it appears therefrom that the automobile was not used, and was not being used, in the service of the owner, then the presumption which otherwise would arise from the mere fact of ownership is completely met.

[4] ID.—PURSUIT OF PERSONAL PLEASURES BY AGENT—LIABILITY OF PRINCIPAL.—In such an action, in order to hold the principal liable for the act of his agent, even where the agency is shown or admitted, it must also appear that the agent was acting in the service of his principal; and if it appears that the agent was seeking his own ends exclusively, in pursuit of his own business or pleasure, at the time he ran into and injured plaintiff, then and in that case the principal is not liable.

APPEAL from a judgment of the Superior Court of Sacramento County. Peter J. Shields, Judge. Reversed.

The facts are stated in the opinion of the court.

Driver & Driver, C. P. McLaughlin and C. E. McLaughlin for Appellants.

Elliott & Atkinson and William A. Sitton for Respondent.

PLUMMER, J.—The two actions herein were tried as one, consolidated upon appeal, presented upon one transcript and one set of briefs, and will be considered and determined as one case.

The cause of action arises from an injury received by the plaintiff by reason of being run into by a Ford automobile truck driven by the defendant William Nunes. Plaintiff had judgment against all the defendants and Goodman and Jones appeal.

On Sunday, May 23, 1920, while on a public road near Walnut Grove, in the county of Sacramento, the plaintiff was injured by a Ford truck then owned by C. W. Jones and Sons and being driven by the defendant William Nunes. C. W. Jones and Sons as a copartnership consisted of defendant C. W. Jones, Fred C. Jones, and G. D. Jones then engaged in farming a tract of land in the Delta region of the Sacramento River. Another copartnership mentioned and referred to in the testimony consisted of Goodman and Jones, the members of which were A. S. Goodman, Fred C. Jones, and G. D. Jones. This copartnership was engaged in farming another and separate tract of land in the same locality. The defendant Nunes testified at first that he was working for C. W. Jones on the Saturday preceding and the Monday following the accident. Later his testimony shows that he was uncertain as for whom or which partnership he was working. The time-books introduced in evidence and other evidence in the case indicate that he was working for the partnership of Goodman and Jones. On the Saturday evening preceding the Sunday on which the injury occurred, it appears from the testimony that the firm of C. W. Jones and Sons had decided to retire the Ford truck from further use and to this end the witness C. D. Jones, in conversation with the defendant A. S. Goodman, made the following request: "If you come over Saturday night I wish you would bring the Ford truck over and leave it at C. W. Jones' place." This place is otherwise mentioned in the testimony as the Jones home place. In compliance with this request, according to the testimony of defendant Goodman, the defendant A. S. Goodman on the Saturday evening preceding the injury took the Ford truck to the C. W. Jones home place and left it there. On his way to the Jones home place with the truck, it appears from the testimony that A. S. Goodman took with him Victor Goodman, the defendant William Nunes and two workmen named King and Wolf.

It further appears from the testimony that a dance was to be given at Walnut Grove, a town some miles distant from

the Jones home place; that the defendant Goodman, Victor Goodman, and William Nunes were desirous of attending the same. It further appears that the defendant A. S. Goodman had asked and received permission to use a certain automobile known as and called the Dodge commercial car in going to this dance and was intending to take with him Victor Goodman and the defendant William Nunes. Upon arriving at the Jones home place with the Ford truck the defendant Goodman went into one of the houses there for the purpose of shaving and otherwise making preparation to attend the dance referred to, to be held at Walnut Grove, and while he was so doing the defendant William Nunes and Victor Goodman, not wishing to be delayed in reaching Walnut Grove and so late at the dance and wishing to have opportunity to arrive at Walnut Grove to shave or get shaved and properly dressed to attend the dance, without permission of anyone, took the Ford truck and drove to Walnut Grove, Victor Goodman doing the driving. The two workmen referred to as King and Wolf accompanied Victor Goodman and the defendant Nunes in the Ford truck to the town of Walnut Grove. It further appears from the testimony that the workman King had severed his employment with C. W. Jones and Sons and was leaving by way of Walnut Grove. After the departure of the defendant Nunes and Victor Goodman for Walnut Grove in the Ford truck, the defendant A. S. Goodman proceeded to the same place in the Dodge commercial car and on the evening of Saturday, the 23d, the following conversation took place between defendants A. S. Goodman and William Nunes. The testimony of William Nunes:

"Q. Prior to the driving of that machine, did you have any conversation that night at Walter Goodman's place with A. S. Goodman? A. No conversation, only I told him the lights were on the bum; he said he would come and fix them. That was all the conversation we had. Q. With whom did you have that conversation that the lights were on the bum? A. Yes. Q. With whom did you have that conversation? A. With A. S. Goodman. Q. Where was that conversation held? A. In Walter Goodman's house. Q. Just prior to your driving the truck away? A. Yes, sir. Q. What, if anything, was said by Goodman as to driving the machine? A. He just simply asked me if I would drive

the truck home.   Q. Repeat as near as you can, his words.
A. Well, he turned around, asked me if I would drive the
machine home, over to C. W. Jones' ranch on Grand Island.
Q. Was that where the truck belonged?   A. Yes; that is
where the truck was left.   Q. Who told you it was to be left
there?   A. Arthur Goodman—A. S. Goodman.   Q. The man
who asked you to drive the Ford truck—did he tell you where
it was going, where you had to drive it?   A. He told me
to take it over to the ranch; leave it there, at C. W. Jones',
leave it, he would meet me with the other car, take me over
to the ranch.   Q. Did you come in town into Walnut Grove,
in that truck?   A. I did.   Q. When?   A. Saturday night.
Q. Who, if anyone, came with you?   A. Victor Goodman,
and a man by the name of Wolf, I do not know his first
name.   Q. Do you know who he was?   A. No—just a ranch-
hand, all I know about him.   Q. Was he working where you
were working?   A. Yes, sir.   Q. That is, on Saturday
night, you came into town, you and Walter Goodman, and
this man Wolf came in this truck.   A. Not Walter Goodman
—Victor Goodman.   Q. Victor, and yourself?   A. Yes.   Q.
A. S. Goodman—apparently there are three Goodmans;
there is Walter Goodman, Victor, and A. S.?   A. Yes, and
Arthur.   Q. A. S. the defendant?   A. Yes.   Q. Where, if
you know, was Victor Goodman working?   A. I could not
say for sure; I think he was working for Goodman & Jones
—Jones & Goodman.   Q. Where did you get into the truck
on that Saturday night when you came into Walnut Grove?
A. On Ryer's Island.   Q. Who, if anyone, was in the truck
when you got in the truck that night?   A. Victor Goodman,
myself, Jack King and Wolf.   Q. Were the others in the
truck when you climbed aboard—or did you all get in the
truck together at that point?   A. I could not state, I guess
we all got in together, I could not state.   Q. You mentioned
a man by the name of King?   A. Yes.   Q. He was in the
truck?   A. Yes, sir.   Q. Do you know where he had been
working?   A. I could not say for sure where he was work-
ing; I think he was working for Jones & Goodman, I am
pretty sure.   Q. Where was Jones & Goodman's place where
the truck was?   A. Known as Unit Two.   Q. As a matter
of fact, Mr. Nunes, was not he working in the same place
where you were working?   A. I could not state; I do not
think he was.   Q. What is it?   A. I do not think he was.

Q. That truck, had you driven it before? A. No, sir. Q. How long had you been working for Jones & Sons? Prior to the accident? A. I was over on Liberty Farms for eight months; to say how long I worked for Jones & Sons, I could not say. I worked for Jones & Goodman or for Jones & Sons. Q. When you speak of Liberty Farms, what property do you refer to? A. That is Unit Two. Q. Do you know who owns Unit One? A. Number——. Mr. Driver: Objected to as incompetent. The Court: If he knows. Mr. Atkinson: Q. Do you know who operates the place known as No. 1? A. C. W. Jones & Sons, No. 1. Q. Who operates No. 2? A. Jones & Goodman. Q. The defendant Goodman? A. Yes, sir. Q. Or C. W. Jones & Sons? A. At times I was working for C. W. Jones & Sons and at times Jones & Goodman. Q. From whom did you get your instructions, if anyone, while you were working there on Unit No. 1, and Unit No. 2? A. I got my instructions most of the time from Goodman.''

Shortly after leaving Walnut Grove the Ford truck while being driven by the defendant William Nunes had come into collision with the person of the plaintiff and furnishes the basis for the cause of action herein.

[1] On the part of the appellants it is insisted that there is no testimony upon which any legal liability can be fixed as against either of the defendants C. W. Jones or A. S. Goodman. On the part of the respondent it is contended that the defendant A. S. Goodman was the general superintendent of C. W. Jones and Sons and as such had authority to give directions to the defendant William Nunes, and that while driving the Ford truck on its way from Walnut Grove back to the C. W. Jones home place, the defendant William Nunes was acting as an agent, servant, and employee of the defendant C. W. Jones, and also under the immediate direction and supervision of the defendant A. S. Goodman. The testimony in the case is of considerable length and, of course, cannot be set forth in full, but it appears therefrom without contradiction that whether the defendant Nunes was on the twenty-second day of May, 1920, in the employ of C. W. Jones and Sons or in the employ of Goodman and Jones, he was, at least, from the evening of that day until and including the following Sunday at Walnut Grove on his own time and in pursuit of his

own pleasure. It also appears without any contradiction that the Ford truck was taken from the Jones home place and driven to Walnut Grove without permission so to do being asked of anyone, by anyone or given by anyone. The contention that the Ford truck was in the service of either C. W. Jones and Sons or Goodman and Jones by reason of the fact that a workman known as Jack King, who, by the testimony of the defendant William Nunes, may have been at work for the copartnership known as C. W. Jones and Sons but by the time-book of Goodman and Jones appears to have been at work for the latter named copartnership, accompanied Victor Goodman and William Nunes in the Ford truck, requires only a statement of facts to show that such a contention is untenable. The fact that the Ford truck may have previously been used to take workmen to town who had severed their connection with either of the partners does not controvert the fact that upon the night in question the Ford truck was taken from the Jones home place without direction or permission for the purpose of enabling Victor Goodman and William Nunes to speed up their arrival at Walnut Grove in order that they might fitly prepare themselves for the coming dance. They were not directed to take the Ford truck to Walnut Grove for the purpose of conveying thereto any other workmen. It further appears from the testimony that the defendant A. S. Goodman while in Walnut Grove on Sunday, May 23d, obtained the services of a workman by the name of Smith and brought this workman to the locality of the ranches herein referred to and that on the twenty-fifth day of May, 1920, the man Smith began work for the partnership of C. W. Jones and Sons. This workman was brought from Walnut Grove to the farm referred to in the Dodge commercial car. It also appears from the testimony that this workman may have been employed for services on the ranch or farm operated by Goodman and Jones, as the time-book introduced in evidence shows that a man by the name of Smith began work for Goodman and Jones on May 24th and continued in such service until May 31st of the year 1920. It further appears that the defendant Nunes was tractor engineer and his employment whether working for C. W. Jones and Sons or Goodman and Jones was along that line and that the employment upon the two ranches and for the two co-

65 Cal. App.—19

partnerships varied from time to time as the occasion required, that is, he would be employed for a period of time on one ranch and then upon the other. The scope of his employment wherever he was at work was in driving a tractor or caring for the same. As to the relation of the defendant A. S. Goodman with the copartnership of C. W. Jones and Sons during the month of May, there is much discussion by the respective counsel. The testimony of the defendant Goodman is to the effect that he was not the general superintendent and had no legal relation whatever to the copartnership of C. W. Jones and Sons during the month of May, 1920, that it had been severed sometime previous to that month. Upon this question and as to who was the general superintendent of C. W. Jones and Sons, the testimony appearing in the transcript is as follows:

"Q. Your name is G. D. Jones? A. Yes, sir. Q. C. W. Jones is your father? A. Yes, sir. Q. Are you a member of the copartnership of C. W. Jones and Sons? A. Yes, sir. Q. Does C. W. Jones and Sons operate—that is, in May, 1920, did C. W. Jones and Sons operate the ranch known as Unit No. 1 that has been referred to here? A. Yes, sir. Q. During the month of May, 1920, who was foreman and superintendent of that ranch? A. Charles Beaton. Q. And did Charles Beaton at that time have full charge of the running of that ranch, when some member of the firm of Jones and Sons was not there? A. Absolutely—he had, absolutely. Q. He had charge at all times? A. Yes, sir. Q. During the month of May? A. Yes, sir. Q. Do you remember the occasion of this accident concerning which this suit is concerned? A. Yes, sir. Q. You heard that talked about? A. Yes, sir. Q. Were you on Ryer Island,—I mean at Unit No. 2 on May 22d, the day before the accident— 1920? A. Yes, I was on Unit No. 1; and also Unit No. 2. Q. Did you have any conversations with the defendant Goodman concerning the Dodge—not the Dodge—concerning the Ford truck? A. Yes, we were talking to each other. Q. Just relate what you said. A. We were talking about a dance— Mr. Atkinson: We object as irrelevant, immaterial, and incompetent. The Court: Objection overruled. A. We were talking about a dance, he was going to a dance; I said, 'If you come over Saturday night I wish you would bring the Ford truck over and leave it at C. W. Jones place.'

The Court: Who was that conversation with? A. A. S. Goodman. . . . Q. You requested Mr. Goodman, one of the defendants, to take that truck from where it was to the home place? A. I absolutely did not. Q. I beg your pardon—what did you say? A. I asked him if he would. Q. What was my question then—question withdrawn. Did you ask Mr. Goodman, one of the defendants in this case, to take that Ford truck to the home place? A. Yes, sir. Q. Had you been accustomed to look out for matters for him from time to time? A. He was a partner of mine. Q. Have you frequently asked Goodman to attend to matters for the copartnership of Jones and Sons? A. He was a partner of mine. Q. You frequently asked Mr. Goodman to attend to matters for the copartnership of C. W. Jones and Sons? A. I was not in the habit of it, no. Q. Have you ever before? A. No, sir, not to my knowledge. Q. Why did you want the truck taken down to the home place? A. I wanted to take it to Sacramento myself to sell it; it was not giving satisfaction. Q. So that it was desirable from a business standpoint for Jones and Sons to have the truck down from Ryer Island to the home place of Jones and Sons, is that it—what is it? A. He was coming over, I simply asked him if he would bring the truck over."

The copartnership referred to by the witnesses herein is that of Goodman and Jones, sometimes called Jones and Goodman and not the copartnership of C. W. Jones and Sons. The copartnership of Goodman and Jones had to do with what is known as and called Unit No. 2. The copartnership of C. W. Jones and Sons had to do with the ranch known as and called Unit No. 1. Both were situated on Ryer Island and some three or four miles apart.

Upon the question as to who was the superintendent and had charge of Unit No. 1, the ranch operated by C. W. Jones and Sons during the month of May, 1920, the testimony of Charles G. Beaton is as follows:

"My business is that of farming superintendent. During the month of May, 1920, I was employed by C. W. Jones and Sons on Unit No. 1, Liberty Farms. I was farm superintendent. My business was keeping the time, setting the men to work. I hired men, sometimes I came down and got them. I told them what to do and where to do it. I know a man named Jack King, I know George Jones, Fred Jones,

C. W. Jones, Victor Goodman, a man named Yancy and A. S. Goodman. On May 22, 1920, Yancy was working for C. W. Jones and Sons. During the month of May Victor Goodman was working for C. W. Jones and Sons. On the twenty-second day of May, 1920, King was working for Jones and Goodman. At that time A. S. Goodman (the defendant) was working on his own ranch. A. S. Goodman was a partner in the firm of Goodman and Jones. A. S. Goodman was not working on Unit No. 1, that I know of about the 22d of May, 1920. A. S. Goodman stayed at Unit No. 1 at nights. He usually went from Unit No. 1 to Unit No. 2 by boat. He got his meals at Unit No. 1. On May 22, 1920, I believe, William Nunes was working for Goodman and Jones. He was not working on Unit No. 1 on May 22d, he was working for Goodman and Jones on Unit No. 2. I have a book that shows when Nunes was working for Goodman and Jones and for Jones and Sons. It is a time-book kept by me as foreman for C. W. Jones and Sons' ranch. Previous to the time I went the book is not in my handwriting, after that it is entirely in my handwriting. I made no entries until April, 1920. The book was kept in the boat-house in Unit No. 1. The boat-house was used as a boat-house and sleeping quarters. I made the entries every night. Mr. William Nunes quit work for Jones and Sons on May 15, 1920, did not work for Jones and Sons on Unit No. 1 after May 15, 1920. During that month I had occasion to go to Sacramento after men. I went in a Ford truck. I never drove the Ford truck to Walnut Grove after anybody to work on Unit No. 1. On one occasion I took a man who had quit work to Sacramento in the Ford truck. The Ford truck had been used by A. S. Goodman several times for the purpose of bringing men to work and taking men away who had quit or been discharged. I went to work for Jones and Sons about the 5th or 6th of April, 1920. Pages 1, 2, and 3 of the time-book are in my handwriting. The words A. S. Goodman under the title of 'C. W. Jones and Sons, time-book for the month of April, 1920,' is in my handwriting. I asked Mr. Goodman if he was on the pay-roll of C. W. Jones and Sons. He told me he did not know. I put his name on the book, I had no instructions to carry his time. I never spoke to Mr. Jones about this entry. Opposite the name of A. S. Goodman is the sum of $200. That is in my own handwriting. That indicates Goodman was paid

$200 for services on Unit No. 1 for the month of April, 1920. That is what he had been paid, he told me that those were his wages. When I was hired, C. W. Jones and George Jones came to the Golden State Company, they stated that A. S. Goodman would instruct me until such time as I was able to take the ranch over and run it. I got instructions from them when I was hired on Unit No. 1 that A. S. Goodman would instruct me how to run the place until I became familiar with the work and that he would sign all checks that were there. The conversation as nearly as I can relate it is as follows: 'C. W. Jones and George Jones came to the Golden State and wished me to go over. I decided finally to go over there. They said A. S. Goodman was working for them at the upper place and also the lower place, Units No 2 and 1. They wanted a man there the whole time that could keep the records and keep the work going at Unit No. 1, so A. S. Goodman could devote most of his time to Unit No. 2. I asked G. D. Jones in what manner they would pay off the men when they were discharged; he said I just give them checks and A. S. Goodman would sign them. Nothing was said as to the position then occupied by Goodman. They did not say he was running it as boss or foreman. They said that he could be over there, that both C. W. Jones and George Jones would be over there two or three days to make any suggestions necessary until the time I got hold of the ropes. They did not say anything about taking instructions about Unit No. 1 from A. S. Goodman, just to work in co-operation with him. Q. I thought you testified that at the time of your employment you were told to report at Unit No. 1 to Mr. Goodman who would tell you what to do. A. I did not say so—to work with him. Mr. Goodman would be there until such time as I got hold of the ropes and could run the ranch. I did confer with A. S. Goodman. He gave me suggestions about the place and the checks which I made out. Checks were signed C. W. Jones per A. S. Goodman for C. W. Jones and Sons. Those checks were made out by him in payment of wages of employees on Unit No. 1. I used to keep the time-book for A. S. Goodman, I helped him out on that work, he would tell me about his men also make out the checks. They were made out and signed by Jones and Goodman for A. S. Goodman. I have paid in

checks for work for C. W. Jones and Sons, signed C. W. Jones and Sons per A. S. Goodman. Q. I understand your testimony, these figures '$200' opposite the name of Goodman in ink; show so far as the record you kept is concerned, Goodman was paid in the month of April, 1920, $200 by C. W. Jones and Sons for work on Unit No. 1. A. I do not know whether he was paid or not. I just put that in there as a matter of record. I got the figures from A. S. Goodman. He said that was the salary he had been receiving. I just put it in that month. I didn't make out a check for him. I was told by C. W. Jones and George Jones that Goodman would put me onto the ropes of running the place, how to run the ranch. I understood from C. W. Jones that I had charge of the place. The checks that were signed by A. S. Goodman were made out by me. A. S. Goodman understood that men were in demand on Unit No. 1. He brought Smith to Unit No. 1. He said: 'Here is Smith, I hired him for you.' The checks referred to were made out both before and after the accident.''

The defendant A. S. Goodman testified upon the points involved as follows:

''I am a member of the copartnership of Goodman and Jones. In the month of May, 1920, the members of that partnership were A. S. Goodman, G. D. Jones and F. C. Jones. C. W. Jones was not a member of that partnership. C. W. Jones is the father of G. D. and F. C. Jones. I was not employed by the firm of C. W. Jones and Sons during the month of May, 1920. During the month of May, 1920, I was operating the farm in which I am interested, Unit No. 2, Liberty Farms, Solano County, California. At one time I was foreman for C. W. Jones and Sons. I ceased being foreman on the twenty-fifth day of February, 1920. I know a man by the name of King, also Nunes, Beaton and Yancy. On the afternoon of May 22, 1920 I left Unit No. 2, went to Unit No. 1 and from there on to Ryer Island to C. W. Jones' home on Grand Island. I went by a Ford truck. G. W. Jones asked me coming over on Saturday night to take the Ford truck over to the C. W. Jones' home place on Grand Island and leave it there. I took the truck to the C. W. Jones home place and left it there. Victor Goodman, Jack King, and William Nunes went with me. After reaching the C. W. Jones home place I went in the

house to see Mr. Jones. I asked him if I could use the Dodge commercial. He gave me permission to use it. I took the Dodge to Walnut Grove. I stayed in Walnut Grove all night. The Ford truck was in Walnut Grove. Q. On Sunday night, May 23d, did you tell William Nunes to take the Ford truck back to C. W. Jones' place? A. No, sir. Q. By the Court: Did you have any conversation with him about the car? A. Not with him—in general I just spoke up, 'Who was going to take the truck back.' He spoke up and said: 'I will take it back.' Q. Did you ever give Nunes any orders about the work at Unit No. 1. A. No, sir. Q. To the men that were working there? A. No, sir. I had driven the Ford truck before May 22, 1920. Had driven it to Sacramento, drove it there on business of C. W. Jones and Sons. When I was foreman I employed men for C. W. Jones and Sons. I have employed the Ford truck in carrying employees of Jones and Sons to Ryer Island. I used the truck in taking men to and from Ryer Island. Have not done so since I ceased to be their foreman. C. Smith worked one day for Jones and Goodman on Unit No. 2 on the twenty-fourth day of May. Then he went to work for C. W. Jones and Sons. I received no pay from C. W. Jones and Sons after February. I told Beaton my compensation was $200 a month. Page 3 of Defendant's Exhibit 1 is then admitted in evidence as follows: 'A. S. Goodman,' under the month of April, 1920, the sum of '$200'; under date of March, 1920, A. S. Goodman $200. I consulted with G. D. Jones about the conversation I had with him in relation to driving the Ford truck over to the C. W. Jones home place.''

The testimony of witness A. S. Goodman as to duties in other matters than this referred to herein was somewhat conflicting. Whether this was due to the fact that the witness apparently was hard of hearing, had a poor memory, or was attempting to prevaricate does not seem to us very material because upon the main questions involved there is in fact, when carefully considered, no conflict in the testimony.

Victor Goodman, who accompanied the defendant Nunes in the Ford truck on the night of May 22, 1920, testified as follows:

"I am a brother of A. S. Goodman, the defendant. During the month of May, 1920, I was working for C. W. Jones and Sons; I was working for them on May 22d; I know the defendant, William Nunes. I know the witness, Yancy. I know Fred Jones, George Jones, C. W. Jones, and Mr. Beaton. During the month of May, while I was working for Jones and Sons, I took my orders from Beaton. I was working on Unit No. 1, on Liberty Island. Mr. Yancy worked there at the same time. I left the island, Unit No. 1 on the evening of May 22, 1920. Mr. Yancy left the same day. We first got a ride in the motor-boat. After we got out of the boat, we took the car and went to the Jones' home place on Grand Island. When we got to the Jones home place, Jack King and A. S. Goodman got out of the machine. I inquired around how long I was going to wait before I got started. I did not get the information, so I just drove off, went off to Walnut Grove. I had to be shaved and get a bath. I was going to the dance, going in a Ford truck. A. S. Goodman drove the Ford truck from the ferry to the home place. I took the truck and went to Walnut Grove. I went there for the purpose of shaving and dressing up to go to the dance. I did not see any of the Jones when I got there. I did not ask anybody for permission to take the car, just took it. The launch we went in belonged to Goodman and Jones—came from Unit No. 1 to Unit No. 2—A. S. Goodman brought it down. Nunes and Jack King were along. When we got to Ryer Island, we got out of the motor-boat and drove to the C. W. Jones place. I had not been accustomed to take the truck in going from Ryer Island to Walnut Grove. That particular Saturday night was the first time I ever took the truck. It was customary for the men to get off from Unit No. 1 on Saturday night. They went from there the best way they could. If the Ford truck was going down, he gave them a ride. If it was not, they would walk. My brother was superintendent of Unit No. 1 at one time. There was no boss with me when I worked the ranch. My brother drove the car down to the Jones home place. I do not know how he got the car."

The testimony of Jack King is to the effect that he accompanied the person mentioned from Unit No. 2 to Ryer Island by the motor-boat, and then by the Ford truck to the C. W. Jones home place; that he and A. S. Goodman

got out of the Ford truck and let the others start off in the Ford truck.

The defendant C. W. Jones testified that he was a member of the firm of C. W. Jones and Sons; that the Ford truck belonged to the copartnership of C. W. Jones and Sons; and that nobody else was interested in the ownership of the truck.

From the foregoing *résumé* of the testimony it seems to us clear that there is not a scintilla of evidence showing that the defendant A. S. Goodman was either a general superintendent or a farming superintendent of the ranch known as Unit No. 1, owned and operated by the copartnership of C. W. Jones and Sons during the month of May, 1920. It does appear that during said month he had authority and did sign checks for the copartnership of C. W. Jones and Sons that had been drawn by the witness Charles G. Beaton. This testimony does not show any superintendency or right of control or any authorization to exercise control over any of the employees belonging to C. W. Jones and Sons, or any of his property, and we do not see how any reasonable inference can arise that such authority was given, or exercised from the mere fact of signing checks. The extent of that authority was not inquired into, but is made the basis of an argument that the defendant A. S. Goodman was thereby vested with general authority as superintendent over the ranch known as Unit No. 1, belonging to the copartnership of C. W. Jones and Sons, and the personal property used in connection therewith. We do not see how any such conclusion can be reached from the premises laid down or how C. W. Jones can be charged with the negligence of the defendant William Nunes, because the defendant A. S. Goodman had signed the copartnership name of C. W. Jones and Sons to checks made out by Charles G. Beaton for the payment of employees working on Unit No. 1.

[2] The testimony clearly establishes that Victor Goodman and the defendant Nunes were off on their own mission, seeking their own pleasure; that they took the Ford truck as a matter of their own convenience without permission of anyone to reach Walnut Grove in time to enable them to get ready to attend a dance to be held there on Saturday evening, May 22, 1920. Under such circumstances, it was the legal duty of the persons who had taken the truck to re-

turn it to the place from whence it had been taken. If the defendant C. W. Jones had learned of the taking of the Ford truck without permission by Victor Goodman and the defendant Nunes and had called either one of them up at Walnut Grove, and directed or requested that they return the truck to the place from which it was taken without permission, and to which place it was their legal duty to return the truck, we do not see how anyone could reasonably argue that the defendant C. W. Jones would by so doing render himself liable for any act of negligence in returning the truck by the person who had wrongfully taken it away, and whose legal duty it was to make the return. If this is true the interposition of the defendant A. S. Goodman, whether he made inquiry as to who was to return the truck or gave orders for its return, would not make any difference, or transfer any liability upon the defendant C. W. Jones. Nor is there anything in the testimony that we have been able to find which fixes any legal liability upon the defendant A. S. Goodman. He is not shown to be an agent of anyone having the ownership in the truck, and whatever he did do, he did of his own volition and not as one having authority in the premises over either Victor Goodman or the defendant William Nunes.

As to whether the court erred in denying the defendants' motion for a nonsuit is, from the view we take of the whole case, wholly immaterial, nor is it necessary to discuss the authorities as to the presumption of agency, arising from testimony showing ownership of an automobile. [3] When all the facts are laid before the court and it appears therefrom that the automobile in question was not used, and was not being used, in the service of the owner, then the presumption which otherwise arises from the mere fact of ownership is completely met. (*Maupin* v. *Solomon,* 41 Cal. App. 323 [183 Pac. 198]; *Brown* v. *Chevrolet,* 39 Cal. App. 740 [179 Pac. 697].)

[4] Nor does it seem to us necessary to lengthen this opinion by either a discussion or an analysis of the decisions of the various supreme courts cited by counsel other than to state that all the authorities hold that in order to hold the principal liable for the act of his agent, even where the agency is shown or admitted, it must also appear that the agent was acting in the service of his principal. If it ap-

pears that the agent was seeking his own ends exclusively, in pursuit of his own business or pleasure, then and in that case the master is not liable. And this is true, no matter how short a time the agent is acting in matters disconnected from the business of his principal, if the injury complained of occurs during that period of time. In the case at bar counsel for the respective parties do not differ as to the law involved but simply seek to draw different conclusions from the testimony in the case, and then make application of the authorities cited. But holding as we do that there is nothing in the testimony showing or fixing legal liability for the act of William Nunes upon either of the defendants A. S. Goodman or C. W. Jones, in that there was no showing whatever that at the time of the injury William Nunes was acting as the agent of C. W. Jones, or that he was under any obligations to obey either the request or command of the defendant A. S. Goodman, or that A. S. Goodman had any authority invested in him to act for C. W. Jones and Sons in relation to their Ford truck, we do not deem it necessary to set forth the law or refer to the decisions having to do with the subject of principal or agent.

It follows from what has been said that the judgment against the defendants A. S. Goodman and C. W. Jones should be reversed, and it is so ordered.

Hart, J., and Finch, P. J., concurred.