## Corbin Fruit Co. v. Decker.
### Same v. Edwards.
(Decided Feb. 13, 1934.)

TYE, SILER, GILLIS & SILER for appellant.

J. B. CAMPBELL and GOLDEN, GILBERT & GOLDEN for appellees.

OPINION OF THE COURT BY JUDGE RICHARDSON—Reversing.

We are required to review a trial of an action for injuries to the occupants of an automobile, and damages to the automoblie, occuring in a collision of the automobile and a truck on a public highway, which resulted in a judgment of $5,000 in favor of Joe Edwards and $300 in favor of A. M. Decker against the Corbin Fruit Company. An appeal is prosecuted from the judgment in favor of Edwards and a motion for an appeal from the judgment in favor of Decker has been made in this court. The determinate question requires a review of the act of the court in overruling a motion for a peremptory instruction at the conclusion of all of the evidence.

In the afternoon of June 4, 1932, Sawyer Decker invited Joe Edwards and his father, Wilbur Edwards, to accompany him in a Chevrolet sedan belonging to A. M. Decker, Sr., from Corbin to Barbourville, Ky. Sawyer Decker operated the car, Joe Edwards occupying with him the front, and Wilbur Edwards the rear, seat. The Decker car traveled on the right side of the center of the concrete road, "never crossing the black line indicating the center of the road." The concrete surface of the road was 18 feet wide. The Decker car rounded a curve, and on reaching the end of it some 75 feet away, the occupants of the Chevrolet sedan, for the first time, observed a truck of the Corbin Fruit Company, approaching on the highway. The Decker car, at the time, was making "30 to 35 miles an hour," going down a slight grade of about 5 per cent., under control and remaining all the time on the right of the center of the highway, when the truck undertook to run around another Chevrolet car on the highway. In running around it, the truck turned to the left, "directly in the path of the oncoming car, operated by Sawyer Decker." The

truck was out to the left across the road, so as to take up all of the portion of the road that was supposed to be occupied by the Decker car, leaving no space whatever for the Decker car to escape the accident, "with the truck drawn directly across the highway in front of the Decker car to such an extent the truck had its front wheels on or near the extreme right edge of the concrete road. There was a rock wall, approximately 10 feet high on the right side of this location, at the scene of the accident, which made it impossible for the Decker car to run off of the road any further to the right to avoid the accident." The truck and the Decker car collided; Joe Edwards was violently thrown into the front of the car, "suffering a very severe concussion of the brain and fracture of the skull, his back was wrenched, his kidneys were seriously injured, and he remained unconscious for eight or ten days, and has been bleeding at the kidneys since said date." The Chevrolet sedan, in which he was traveling, was practically demolished. The injuries sustained by Sawyer Decker and Wilbur Edwards are not here involved. The Corbin Fruit Company was engaged in the wholesale fruit, vegetable, and grocery business at Corbin. N. B. Smith, who was driving the truck, had been working by the day for it for about four years, at the wage of $3 a day. The accident occurred about 3 p. m. on Saturday, June 4, 1932. Smith worked for the Corbin Fruit Company on that day until noon, for which he was paid $1.50 by the Corbin Fruit Company. R. E. Hill, its president and general manager, was not on duty, because of a sprained ankle which confined him at his home. About noon Smith completed his half day's work for the fruit company, and thereafter his time was his own, and without the knowledge or consent of the fruit company or any one acting for it, for the purpose of moving his household goods from Corbin to "Gray's Place," he took possession of the truck, loaded his household goods, and, in company with W. W. Wade and Glynn Kidd, carried them in the truck, traveling the highway, where the accident happened, from Corbin to "Gray's Place," making during the afternoon three round trips. Mrs. George McDonald conducted "a lunch counter in a little store at a filling station," estimated by the witnesses to be from 250 to 400 yards south of where the accident occurred. She testified that Smith brought to her place "potatoes and beans," about 4 or 5 o'clock, after the

wreck. She claims she did not remember anything he brought that afternoon to her place except the potatoes and beans. Before he brought them she had observed him passing on the highway in the truck. She had given Smith an order for candy and chewing gum the evening before the accident to be filled at the convenience of the fruit company. Clarence McDonald, on this topic, was asked and answered thus:

"Q. I wish you would state what you know about the Corbin Fruit Company making deliveries to your mother the afternoon the wreck happened. A. Well, they did deliver some things that afternoon.

"Q. Tell us what they delivered to your mother that afternoon. A. They delivered some candy and chewing gum,—and that's all I remember—at one time, I am sure.

"Q. Do you remember anything else? A. Well, they delivered some beans and potatoes just for family use, that's all.

"Q. Who made that delivery, with reference to Smith and the Corbin Fruit Company's truck? A. Well, Smith brought them himself in the truck. * * *

"Q. Was it on the same trip that he delivered the stuff out there to your mother as he went down? A. I am not sure, I think it was.

"Q. Now, this happened about what time of the day? A. Well, about the middle of the afternoon.

"Q. Mr. McDonald, do you know where Smith had been on this trip? A. Well, I think he was going to Gray's. * * *

"Q. How do you know he went to Gray's then? A. That's where he said he was going to.

"Q. You don't know where he went? A. Not positive.

"Q. Do you know when he came back? A. Yes, sir.

"Q. About what time was it when he came back? A. About the middle of the afternoon. * * *

"Q. Where did you see him? A. He passed

home and over in town and he come out to the house there and stopped twice.

"Q. After the wreck? A. After wreck, yes, sir. * * *

"Q. Was that when he delivered the chewing gum? A. No, sir.

"Q. When did he deliver the chewing gum to her? A. He delivered the chewing gum in the afternoon.

"Q. What time in the afternoon? A. I don't know what time in the afternoon.

"Q. Was that after the wreck? A. I am not sure, I think it was before the wreck.

"Q. Well, he didn't stop going out? A. Not at noon, no.

"Q. Did he make another trip in the afternoon, going toward Gray's? A. Yes, sir.

"Q. Did he stop that trip? A. I think he did.

"Q. What did he have in his car? A. I think he had some household goods, if I am not mistaken.

"Q. Do you know where he come from with those household goods? A. Over in town—over at Corbin.

"Q. Do you know where he went to? A. He said he went to Gray's. * * *

"Q. Anybody go with him on that trip? A. Well, if I am not mistaken I think Mr. Ward was with him and two of his boys was with him.

"Q. And he had some household goods in the car? A. Yes, sir.

"Q. Now, what were those articles you say he delivered to your mother that afternoon? A. Some candy and some chewing gum.

"Q. What did he have it in? A. In boxes of candy and boxes of chewing gum—boxes.

"Q. Do you know where he got that candy and chewing gum? A. He brought it with him out of the truck. * * *

"Q. But you don't know where he brought it from? A. I don't know positively about it. * * *

"Q. And you don't know which one of the trips it was he stopped at your mother's house? A. No, sir, I don't."

Jack McDonald was asked and answered as follows:

"Q. When you came in that afternoon, was there any candy that wasn't there before that in your mother's store? A. Yes, sir.

"Q. And was there any new chewing gum that wasn't there before? A. Yes.

"Q. Were you there when Mr. Smith brought it? A. No, sir."

Edwards and Decker contend that the use of the truck of the Corbin Fruit Company by its employee Smith, on the occasion of the accident, gives rise to the presumption he was engaged in its business and the proof of such alone was sufficient to take the case to the jury and to sustain its verdict. See Wood v. Indianapolis Abattoir Co. of Ky., 178 Ky. 188, 198 S. W. 732; Mullen & Haynes Co. et al. v. Crisp et al., 207 Ky. 31, 268 S. W. 576; Bowen v. Gradison Con. Co. et al., 224 Ky. 427, 6 S. W. (2d) 481; Dennes v. Jefferson Meat Market, 228 Ky. 164, 14 S. W. (2d) 408; Ashland Coca Cola Bottling Co. v. Ellison et al., 252 Ky. 172, 66 S. W. (2d) 52. They rest the right to have the case submitted to the jury upon the presumption arising from proof of the fact the fruit company owned the truck and Smith had been in its employment and operated it on days previous to, and had delivered candy and gum the evening of, the accident. To render, or to hold, the fruit company liable for the injuries sustained and the damages claimed, the relation of principal and agent, or master and servant, between it and Smith at the time and place of the accident, is indispensably necessary. Something more than mere ownership of the instrument in charge of the employee is required to establish, in such cases, the master-servant relation. In Brady v. B. & B. Ice Co., 242 Ky. 138, 45 S. W. (2d) 1051, 1052, it is said:

"'Something more than ownership of a motor vehicle is required to establish agency, or the relation of master and servant, between the owner and the borrower or hirer negligently operating it.' Since the automobile has come into common use, much has been written on the question of the liability of an owner who intrusts his automobile to another,

and there is some diversity of opinion, but there is practical agreement of authority as to the general rule that aside from the doctrine of respondeat superior, ordinarily a person who owns or controls a motor vehicle is not liable for the negligence of one whom he permits to use it. Keck's Adm'r v. Louisville Gas & Elec. Co., 179 Ky. 314, 200 S. W. 452, L. R. A. 1918C, 654; Tyler v. Stephen's Adm'x, 163 Ky. 770, 174 S. W. 790; Doss v. Monticello Elec. L. & P. Co., 193 Ky. 499, 236 S. W. 1046. See, also, list of cases from 20 states in 36 A. L. R. page 1138.''

That which a party wishes the jury to find, he must prove. We are imperatively driven to the conclusion that the evidence in behalf of the fruit company abundantly overcomes the presumption arising from the evidence in behalf of Edwards and Decker, merely showing it owned the truck, and prior to the accident Smith engaged with it in the fruit company's business, and had delivered the candy and chewing gum as detailed by the witnesses in their behalf.

One is responsible for another's acts only when the relation of principal and agent, or master and servant, exists. Bickel Coal Co. v. Louisville Tire Co., 228 Ky. 239, 14 S. W. (2d) 775. The liability for the servant's act rests upon the doctrine of agency. Bray-Robinson Clothing Co. v. Higgins, 210 Ky. 432, 276 S. W. 129; American Savings Life Ins. Co. v. Riplinger, 249 Ky. 8, 60 S. W. (2d) 115. The doctrine of the master's liability for the acts of the servant applies only where the master-servant relationship existed at the time and in respect to the thing causing the injury, and the master had the right of control. American Savings Life Ins. Co. v. Riplinger, supra. The master is never responsible for the acts of the servant unless the act is done in execution of the master's authority, express or implied. Reynolds' Adm'r v. Black Mt. Corp., 240 Ky. 673, 42 S. W. (2d) 916.

The evidence showing Smith was employed by the day by the fruit company and had been so employed for four years, but on the day of the accident he had worked until noon of that day, when, without either the knowledge or consent of the fruit company or any one acting for it; he took charge of and used the truck for the purpose of moving his household goods from Corbin to ''Gray's Place,'' is neither contradicted nor disputed.

These facts perceptibly distinguish this case from that line of cases where a servant, driving a car of the master, departs from the usual course of travel to serve his own purpose, and having done so, while on his way to the master's place of business, an accident occurs by his negligence; also, from those cases where an employer has given an employee permission to use his car for a specific purpose of his own with express or implied direction to return the car to a particular place in order to perform the service of the master, and when the servant has used the car and accomplished a specific purpose of his own at a point some distance from the place where he was expressly or impliedly directed to return the car and was on his return trip with the car to the master's garage when an accident occurs, injures another. Eakin's Adm'r v. Anderson, 169 Ky. 1, 183 S. W. 217, Ann. Cas. 1917D, 1003; Tyler v. Stephan's Adm'x, 163 Ky. 770, 174 S. W. 790; Crady v. Greer, 183 Ky. 675, 210 S. W. 167; Winslow v. Everson, 221 Ky. 430, 298 S. W. 1084; Challinor v. Axton, 246 Ky. 76, 54 S. W. (2d) 600; Model Laundry v. Collins, 241 Ky. 191, 43 S. W. (2d) 693.

It is universally agreed that where an employee, while on his own time, and in pursuit of his own pleasure or business, takes the car of his employer without permission so to do being asked of any one, by any one or given by any one, and while operating it upon or along a highway, runs into and injures another, the employer is not liable. See Musachia v. Jones, 65 Cal. App. 283, 223 P. 1006; Fanny Brenner v. Walsh, 206 App. Div. 469, 201 N. Y. S. 482; Susser v. DeLovage, 73 Mont. 354, 236 P. 1082; Cannon v. Goodyear Tire & Rubber Co., 60 Utah, 346, 208 P. 519, 521; Glass v. Wise & McAlpin, 155 La. 477, 99 So. 409; Fiocco v. Carver, 234 N. Y. 219, 137 N. E. 309, 310; Mullen & Haynes Co. v. Crisp, 207 Ky. 31, 268 S. W. 576; Crady v. Greer, 183 Ky. 675, 210 S. W. 167; Kecks' Adm'rs v. Louisville Gas, etc., Co., 179 Ky. 314, 200 S. W. 452, L. R. A. 1918C, 654; Eakin's Adm'r v. Anderson, 169 Ky. 1, 183 S. W. 217, Ann. Cas. 1917D, 1003; Tyler v. Stephan's Adm'x, 163 Ky. 770, 174 S. W. 790; Wyatt v. Hodson, 210 Ky. 47, 275 S. W. 15; Winslow v. Everson, 221 Ky. 430, 298 S. W. 1084; Model Laundry v. Collins, supra; Packard-Louisville Motor Co. v. O'Neal, 248 Ky. 438, 58 S. W. (2d) 630; Roselle v. Bingham, etc., 242 Ky. 496, 46 S. W. (2d) 784. The principles reiterated in these cases

are applicable and controlling in the present one. In Cannon v. Goodyear Tire & Rubber Co., supra, the driver of the machine on previous occasions had been given permission to use a truck for his own accommodation; but on the day of the accident, no such permission had been given him. On the last trip the driver delivered a package for the employer, and when returning the truck to the garage he decided to use it in moving furniture for himself, and he spent the remainder of the day at his home on his own business. At a quarter of 6 he started with the truck in the direction of the garage, traveling certain streets, and at a point east on Second West street, an accident occurred, in which Cannon was injured. It was conceded the driver was at his home on the day of the accident from the time of making his last delivery, about 12:15 p. m., down to the hour when he started to return the truck to the garage, and especially down to the time of the return trip. It was contended that from the point where he started to the garage he was in the service of the defendant because his final duty to the master was to return the truck to the garage. It was held that it was the duty of the driver to return the truck to the garage, even if it was done at a belated hour, the same as if it would have been his duty to return it had he stolen it and driven it away. In the opinion, it was written:

"There is both a moral and a legal duty imposed upon every man to restore to the owner property wrongfully taken or withheld, and this duty is in no sense dependent upon the relation of master and servant or of employer and employee. Hence, when we speak of the duty of Kratzer to return the truck to the garage, it signifies but little in the instant case, unless from the nature of the case we can also determine the character of the duty. As further emphasizing the views of the writer, let us suppose that when Kratzer made his last delivery for the day at the Short Line depot he had immediately returned the truck to the garage in pursuance of his employer's instructions. Suppose further that after returning the truck to the garage he had later called for it and taken it away and had then done the very things he did do, as detailed in the evidence. In such case it could not be consistently contended that in returning the truck to the garage he was engaged in the business of the defendant or

acting within the scope of his employment. That such a contention could not be sustained by either reason or authority seems to me to be beyond the possibility of rational disputation. It would not only be contrary to reason and authority, but would also be the rankest kind of injustice and oppression, to hold that returning the truck to the garage in the case supposed was a service within the scope of Kratzer's employment so as to render his employer responsible for his negligence. I see do difference in principle, as far as the proposition of law is concerned, between the case supposed and the case disclosed by the record. In the one case he wrongfully withheld possession of the truck after it should have been returned to the garage; in the other he wrongfully took it into his possession. In either case he was both morally and legally bound to return it, entirely independent of any duty incident to his employment."

In Fiocco v. Carver, supra, the defendants, who were engaged in business, sent a truck load of merchandise from Manhattan to Staten Island. The duty of the driver, when he had made the delivery of the load, was to bring back the truck to the garage. Instead of doing that, he went to visit his mother. A neighborhood carnival was in progress. A crowd of boys asked the driver for a ride, and in response to the request he made a tour of the district, stopping in front of a pool room, where he left his truck for a few moments. The plaintiff, a child of eleven years, began climbing up the side of the truck. The driver ordered him to get off. Before he got off, it was started without warning. The child's foot was drawn into the wheel and injured. Upon these facts the jury returned a verdict, finding the driver was in the course of his employment. The rule was upheld by the Appellate Division (200 App. Div. 33, 192 N. Y. S. 493) by a divided court. The Supreme Court declined to permit the judgment to stand. The court, after reciting the facts, said:

"The dual function, if it existed, can no longer rest upon presumption. Regularity will no longer be taken for granted when irregularity is written over the whole surface of the picture. We will no longer presume anything. What the plaintiff wishes us to find for him, that he must prove. We turn, then, to the driver's testimony to see whether anything

there, whether read by itself or in conjunction with the plaintiff's narrative, gives support for the conclusion that the truck was engaged at the moment of the accident in the business of the master. All that we can find there, when we view it most favorably to the plaintiff, is a suggestion that after a temporary excursion in streets remote from the homeward journey, the servant had at last made up his mind to put an end to his wanderings and return to the garage. He was still far away from the point at which he had first strayed from the path of duty, but his thoughts were homeward bound. Is this enough, in view of all the circumstances, to terminate the temporary abandonment and put him back into the sphere of service? We have refused to limit ourselves by tests that are merely mechanical or formal. Riley v. Standard Oil Co. of N. Y., 231 N. Y. 301, 132 N. E. 97 [22 A. L. R. 1382]. Location in time and space are circumstances that may guide the judgment, but will not be suffered to control it, divorced from other circumstances that may characterize the intent of the transaction. The dominant purpose must be proved to be the performance of the master's business. Till then there can be no resumption of a relation which has been broken and suspended.''

Accepting the testimony of the McDonald boys, which tends indefinitely to show that Smith, on some one of his trips that afternoon, delivered at their mother's place of business candy and chewing gum, and presuming, when doing so, Smith was furthering the master's business, and acting within the scope of his employment, it cannot be doubted that on the completion of the delivery of the candy and chewing gum at the place of business of Mrs. McDonald, thereafter his time was his own, occupied by him in the transportation, without the knowledge and consent of his employer, with the truck, of his household goods to ''Gray's Place,'' and while returning the truck to the point from which he had so taken it, clearly he was not furthering the business of his employer, but serving his own purpose. From the moment of the delivery of the candy and chewing gum, if he did deliver it to Mrs. McDonald's store on one of those trips, thereafter the relation of principal and agent, or employer and employee, did not exist between Smith and the Corbin Fruit Com-

pany. Reverting to the language in Fiocco v. Carver, supra:

> "Location in time and space are circumstances that may guide the judgment, but will not be suffered to control it, divorced from other circumstances that may characterize the intent of the transaction. The dominant purpose must be proved to be the performance of the master's business. Till then there can be no resumption of a relation which has been broken and suspended. We think the servant's purpose to return to the garage was insufficient to bring him back within the ambit of his duty."

We are not dealing with a case "where, in the course of a continuing relation, business and private ends have been coincidentally served. We are dealing with a departure so manifest as to constitute an abandonment of duty, exempting the master from liability till duty is resumed."

It was the duty of Smith to return the truck to the point where it was taken by him. In taking it and returning it, he was on his own time, not subject to the direction, either expressed or implied, of his employer, to return it to the place he had obtained it without the latter's knowledge or consent.

As was said in Cannon v. Goodyear Tire & Rubber Co., supra, it was his moral and legal obligation to return the machine to the owner's garage "independent of any duty incident to his employment." Thus far we have considered the testimony of the two McDonald boys sufficient to show the candy and chewing gum were delivered on the trip made at the time the accident occurred; when in fact the testimony of Mrs. McDonald shows undoubtedly the "potatoes and beans" were delivered after the wreck, causing the injury to Edwards and the damage to the car of Decker. And the testimony of the two McDonald boys concerning the delivery of the candy and chewing gum in the truck is so indefinite and uncertain as to make it a question of conjecture or guess whether the same were delivered on the trip of the accident or a previous or later trip, or after the wreck; neither is sufficient upon which to rest a judgment. It is not doubtful that at the time of the accident, the relation of employer and employee did not exist between the Corbin Fruit Company and Smith, but he was operating the truck on his own time and in

pursuance of his own business without the authority, knowledge, or consent of the Corbin Fruit Company, which entitled the latter to a directed verdict, notwithstanding the testimony relating to the delivery of the candy and chewing gum on some one of the trips of the truck while delivering Smith's household goods.

Wherefore the judgment is reversed as to Edwards; the motion for an appeal as to A. M. Decker, Sr., is sustained, the appeal granted, and the judgment as to him is reversed, for proceedings consistent herewith.

Whole court sitting.