[L. A. No. 23272. In Bank. Apr. 22, 1955.]

HARVEY LEMING, Respondent, v. OILFIELDS TRUCK-ING COMPANY (a Corporation) et al., Appellants.

Baker, Palmer & Wall, Claude F. Baker and Jack W. Bradley for Appellants.

Oscar F. Catalano, J. A. Palmquist and A. V. Falcone for Respondent.

SCHAUER, J.—Defendants-appellants herein are Oilfields Trucking Company and Phoenix Construction Company, two corporations, hereinafter called, respectively, Oilfields and Phoenix. They appeal from a judgment in plaintiff's favor, entered on a jury verdict, in his action to recover for personal injuries suffered in a trucking accident. The judgment now on appeal was rendered on a second trial of the action. The driver of the tractor and trailer which caused the injuries, one Mason, was also named as a defendant, and on the first trial judgment was recovered against him as well as against

Oilfields and Phoenix. That judgment became final against Mason, but on motion of Oilfields and Phoenix a new trial was granted as to them and they are therefore the sole defendants involved in the present appeal from the judgment which followed the new trial. We have concluded that, contrary to defendants' contentions, the evidence is sufficient to support the verdict, no error prejudicial to defendants occurred in instructing the jury, the verdict is not as a matter of law excessive, and the judgment should be affirmed.

At a late evening hour on Tuesday, July 10, 1951, as plaintiff, a truck driver, was standing between two trucks which were parked, one in front of the other, along the curbing of a street in Bakersfield, a tractor and trailer driven by Mason along the same street struck the rear one of the parked trucks, causing it to strike and injure plaintiff. Plaintiff's action against the two defendant corporations is predicated upon the allegation that at the time of the accident Mason was operating the tractor and trailer ''as agent and employee and within the scope of authority and agency of his employers, Phoenix . . . and Oilfields. . . .'' As grounds for reversal defendants urge (1) insufficiency of the evidence to support the jury's implied finding that at the time the accident occurred Mason was acting within the scope of either an employment or agency relationship, (2) error in instructing the jury, and (3) excessive damages awarded under the influence of passion or prejudice.

### Sufficiency of Evidence

Viewing the evidence in the light most favorable to plaintiff-respondent, as is required when sufficiency of the evidence to support the findings is challenged (*Richter* v. *Walker* (1951), 36 Cal.2d 634, 640 [226 P.2d 593] ; *Estate of Bristol* (1943), 23 Cal.2d 221, 223 [143 P.2d 689]), it appears that the two defendant corporations are enterprises of the Phoenix brothers, of Bakersfield. Harry Phoenix was president of Oilfields and vice president of Phoenix. Percy Phoenix was president of Phoenix and vice president of Oilfields. The business of Oilfields was trucking or hauling for hire, and that of Phoenix was construction. The corporations conducted their operations from a base comprising an area of 8 to 9 acres mutually occupied by them some 2 or 3 miles south of Bakersfield, on which they maintained in common their respective offices, shops, yards, garages, warehouses, storerooms, equipment and appliances.

Prior to May 21, 1951, the two corporations entered into

a written contract with the Division of Highways of the State of California by which they agreed to do certain road resurfacing referred to as the Haypress Canyon or Bena job and located some 18 to 30 miles east of Bakersfield. This contract was made by the corporations as joint venturers, they were so designated therein, and an officer of each corporation confirmed that "that was a joint venture between" Oilfields and Phoenix. The two corporations "together as joint venturers" posted a performance bond with the state for this job. They had previously engaged as joint venturers on highway jobs, and the purpose of the joint ventures was to enable them "to pool the resources of the two corporations" in order to qualify to bid for construction jobs in higher amounts. Oilfields owned some 170 trucking units and employed about 90 truck drivers. Early in June, 1951, Butler, its personnel superintendent, hired Mason, a former employe, as a truck driver. He assigned Mason to the Haypress Canyon job for the duration thereof as driver of tractor No. 382 combined with a trailer on which was mounted a cement spreader required for the work. Both the tractor and the trailer were owned by Oilfields, and the cement spreader was owned by Phoenix.

Defendants' yards, located on the west side of Highway 99, south of Bakersfield, were operated on a 24-hour schedule with dispatchers on duty day and night for dispatching drivers and trucking equipment. The evidence was not specific as to whether or not Mason was subject to the usual dispatching routine, which included written dispatch orders and a daily master "truck movement sheet" on which were listed the name of truck and of driver, number of the truck, and purpose or destination of the trip. Mason operated the cement spreader which accompanied tractor No. 382, to which he had been assigned, at the Haypress Canyon job from Monday through Friday of each week, working an average of 10 hours a day. He was the sole and exclusive driver and operator of this piece of equipment while he was on that job. Trucks bringing bulk cement to the job would arrive from 3 o'clock in the morning on, and Mason's work included having the cement spreader ready at that time and assisting in unloading the trucks and loading the spreader. He slept at the job site in a convertible bed in his own automobile. He was the only employe of defendants who remained at the job site overnight. Two foremen and a superintendent of defendant Phoenix, who were in charge at the job site, knew of this practice. Each Friday night Mason would drive

tractor No. 382 and the spreader equipment from the job site back to defendants' yards for servicing, and would pick it up again about 4 o'clock Monday morning and return to the job.

On Friday night, July 6, 1951, Mason drove the equipment to the Bakersfield yards as usual, and returned it to the job in the early morning of Monday, July 9. Because a breakdown of the pug mill at the job had interrupted cement spreading work, Mason took the equipment back to defendants' yards in the afternoon of the same day (Monday). About 5 p. m. of the following day (Tuesday, July 10) the job superintendent notified the dispatcher at the yards to get Mason and the spreader equipment back on the job. The dispatcher was unable to locate Mason, and requested Oilfields' personnel superintendent, Butler, to do so. Butler located Mason at a café about 6 p. m., and in Mason's words "told me to be at the Haypress Canyon job the following morning . . . about 5 :00 o'clock . . . [and] to have the truck out there in the morning, ready to go to work with the cement mixer, spreader." Butler testified that he did not "take any memorandum of any kind to Mason . . . [but] went to give him verbal orders." Mason left the café and drove around for a time in his own car, with one Smith and two girl friends; he had one drink of vodka mixed with orangeade during this time. About 9 :30 p. m. Mason and his three companions arrived at defendants' yards. Mason went to the Oilfields area and took tractor 382, which he had been using, and moved it to the Phoenix area, where he hooked up the trailer and cement spreader. He also arranged for Smith to drive Mason's car to the job site and meet Mason there. He then drove the spreader equipment out on the highway without notifying the dispatcher of his intended departure. He was going to take it to the job site so it would be there the following morning when the bulk truck arrived. As he proceeded on his customary route from yards to job site, he drove into the rear end of the parked truck, injuring plaintiff.

With respect to the extent of supervision exercised over Mason in his work, Butler, the personnel superintendent who assigned Mason to the Haypress Canyon job, testified as follows: "Q. Assuming the truck was out there [at the job site] all week, would Mason have to come in to find out what his dispatch orders were? A. He received those orders out there, what he was to do, after he was dispatched to the

job." Mason stated that "I was my own boss there," and also testified as follows: "Q. And when you picked the truck up on . . . Monday morning did you have to see anyone to pick up that truck? A. I never did, I knew where I was going.

"Q. You just went in and got in the truck and drove out to the job, is that right? A. That is right, checked my tires and whatnot.

"Q. That same routine continued while you were working on the Haypress job, is that right, sir? A. Yes."

Esponda, who was shop foreman for Oilfields and was on duty in the yards at the time Mason took the equipment out just before the accident, testified that although he saw Mason leaving and tried to stop him, "the only reason . . . [I was] trying to stop this truck was because no clearance lights were burning on the trailer, . . . It wasn't because he didn't have any business with that equipment" and that the witness did not see Mason hook the cement trailer onto the tractor although Mason "probably did because that is where it is usually parked. He took up on his own, he kind of more or less worked on his own." The witness further stated that he knew Mason "belonged to that equipment" and was assigned to it, and that he had never seen "any dispatch orders on Mason."

The above recited evidence is manifestly sufficient to support the implied finding of the jury that Mason was acting within the scope of his employment and with at least the implied permission of his employer in undertaking to return the cement spreading equipment to the job site in order to have it available for use there the following morning. Other evidence, relied upon by defendants, merely creates a conflict which was resolved by the jury in plaintiff's favor and will not be considered on appeal. (*Richter* v. *Walker* (1951), *supra,* 36 Cal.2d 634, 640, and cases there cited.)

Phoenix contends, nevertheless, that Mason was an employe of Oilfields alone, and not of Phoenix, and that "The evidence is insufficient to support a judgment against . . . Phoenix . . . as a joint adventurer of . . . Oilfields . . ., since appellant [Phoenix] exerted no control over Mason." Phoenix expressly concedes, however, and the evidence indicates, that after Mason "got on the job with the equipment, the job superintendent of Phoenix . . . directed him in the spreading of the cement." It was the same superintendent and employe of Phoenix, one Flem, who requested the yard

dispatcher on the day of the accident to get Mason and the spreader equipment back on the job, and the cement spreader which was mounted on the trailer and was at Flem's request being returned to the job site was owned by Phoenix. ██ Not only does the above evidence show that Phoenix actually did exercise control over Mason, but it appears to be the general principle that "The relationship of joint venturers is that of a mutual agency, akin to a limited partnership" (*Campagna* v. *Market St. Ry. Co.* (1944), 24 Cal.2d 304, 308 [149 P.2d 281]), and that the negligence of one joint venturer or of his employes acting in connection with the joint venture is imputed to the other joint venturers. (See *Shook* v. *Beals* (1950), 96 Cal.App.2d 963, 970 [217 P.2d 56, 18 A.L.R.2d 919]; *Hupfeld* v. *Wadley* (1948), 89 Cal.App.2d 171, 175-176 [200 P.2d 564]; *Di Vita* v. *Martinelli* (1932), 123 Cal.App. 392, 394 [11 P.2d 423]; 48 C.J.S. 870, § 14-e.) It follows that the evidence supports the judgment against Phoenix equally with Oilfields.

### Jury Instructions

As noted hereinabove, plaintiff's cause of action upon which trial was had was based solely upon the theory of *respondeat superior* in accord with the allegation in his complaint (amended), that at the time of the accident Mason was acting "as agent and employee and within the scope of authority and agency of his employers," the two defendant corporations. This allegation was specifically denied by both Phoenix and Oilfields in their answers. Oilfields further alleged "that any operation of said tractor . . . by the defendant Mason was without any authority whatsoever," and as an affirmative defense pleaded that Mason's operation of the equipment "was a taking of said equipment . . . without the permission of this defendant as the owner thereof for the purpose of said defendant Mason using and operating the same without any permission or consent whatsoever."

On defendants' behalf Butler testified that his instructions to Mason on the evening of the accident were that "he was to report at the yard at 5:00 o'clock a. m. [the next morning] and pick up his truck and go to Haypress Canyon and be out there at 6:00 o'clock." Mason, at one point in his own testimony, also stated that Butler "told me to report to Bena [Haypress Canyon] the following morning . . . around 5:00," and it was shown that at the coroner's inquest[1] follow-

---

[1]Another truck driver, not here involved, died from injuries received in the same accident.

ing the accident Mason testified that "I had direct orders to report to the job at five o'clock in the morning . . . But not to go out prior to morning. . . . [T]hey don't make a habit of having or letting the drivers go out at night," and that this was the first time he had "taken a truck out at night to go to a job that did not start 'til morning." Also at the inquest, in response to the question "What were your reasons for taking the truck out at that time of night when you don't have to be there until morning?" Mason replied, "Well, I sleep in my car all the time in order to avoid hotel rooms" and that he had planned to sleep in his car the night of the accident. Smith, who with two girls had been riding around with Mason in the latter's car, testified, but Mason denied, that Mason had invited first one of the two girls and then the other to ride with him in the truck to Haypress Canyon, but that each had refused.

Defendants contend that in the light of the pleadings and the above recited evidence in their favor, the court failed to fairly instruct the jury on their defense that at the time of the accident Mason was not acting within the scope of his employment and did not have permission of the defendant owner to operate the equipment, but instead was a "daytime employee" who had taken out the equipment at night for private purposes of his own and, in the language of defendants' argument, "as a device to lure two girls . . . to Haypress Canyon."

At the request of Oilfields the court did instruct the jury that Oilfields had alleged as part of its answer that any operation or use of its equipment by Mason "was a taking of said equipment by . . . Mason without the permission of this defendant [Oilfields] as the owner thereof for the purpose of said . . . Mason using and operating the same without any permission whatsoever." The court refused, however, to further instruct, as requested by Oilfields, that "if the jury believes that the taking of any equipment belonging to defendant Oilfields . . . by . . . Mason was without the permission of defendant Oilfields . . . as the owner thereof for the purpose of . . . Mason using and operating the equipment without any permission of defendant Oilfields" then the verdict should be in favor of Oilfields and against plaintiff.

Since, as in *Schellenberg* v. *Southern Calif. Music Co.* (1934), 139 Cal.App. 777, 783 [35 P.2d 156], the question of whether Mason had permission to take the equipment at night bore upon the issue of whether he was operating it

within the scope of his employment, and inasmuch as the evidence would support a finding of lack of permission, defendants were entitled to have the refused instructions given, unless the point was adequately presented by other instructions. ■ "It is the duty of the court to instruct on every theory of the case finding support in the evidence." (*Daniels* v. *City & County of San Francisco* (1953), 40 Cal.2d 614, 623 [255 P.2d 785] ; see also *Wells* v. *Lloyd* (1942), 21 Cal.2d 452, 459 [132 P.2d 471] ; *Musachia* v. *Jones* (1924), 65 Cal.App. 283, 297-298 [223 P. 1006] ; *Varner* v. *Skov* (1937), 20 Cal. App.2d 232, 238-240 [67 P.2d 123] ; *Stickel* v. *Durfee* (1948), 88 Cal.App.2d 402, 406 [199 P.2d 16] ; 24 Cal.Jur. 833, § 96.)

At plaintiff's request the jury were told: Defendants Oilfields and Phoenix "are corporations and as such each can act only through its officers and employees, who are its agents. The acts and omissions of an agent, done within the scope of his authority, are, in contemplation of law, the acts and omissions respectively of the corporation whose agent he is." (Based on BAJI 54-G.) Oilfields and Phoenix "have been sued on the theory that each of them was a principal for whom . . . Mason was acting as agent, within the scope of his authority, at the time of the events out of which the accident occurred. Whether the facts support this theory is an issue that you may have to decide, inasmuch as plaintiff's contentions in this respect have been denied. If you find that . . . Mason was negligent, you then must decide whether, at the time of . . . the accident, he was acting as agent for the defendant corporations or either of them and within the scope of his authority, and if you find he was acting as agent of the defendant corporations or either of them and within the scope of his authority, then you must also find liable the defendant corporations or . . . corporation for whom he was acting." (Based on BAJI 54-B, Adapted.) Oilfields and Phoenix were engaged in a joint enterprise and therefore Phoenix "is as responsible" as Oilfields "for all acts of employees of either corporation, which are done within the course and scope of their employment on work included in or reasonably necessary to carry on the enterprise contemplated by the joint venture." The nature of a joint venture was also explained to the jury.

Further instructions given at plaintiff's request were that "An agent is a person who, by virtue of and pursuant to an agreement with another called the principal, undertakes to represent the principal in dealing with third persons, or

undertakes to transact some other business, to manage some affair, or to perform some service, for the principal, whether for compensation or gratuitously. The agreement may be oral, written, express or implied. The term 'agent' is a broader term than either 'servant' or 'employee.' For the purposes of this trial, a servant or an employee is an agent, but one may be an agent, although he is neither servant nor employee. The test to determine whether at a given time one person was the agent of another is to ascertain whether or not at that time the former was subject to the orders and control of the latter and whether or not the latter had the right of control or the right to discharge the former for disobedience or misconduct." (Based on BAJI 54-B, 1950 Supp.)

The jury were next told, at the request of defendant Phoenix, that "If you find from the evidence that at the time of the accident . . . Mason was driving a vehicle owned by Oilfields . . ., and that on said date . . . Mason was an employee of said corporation, then you may infer from such evidence that said . . . Mason was acting as the agent of said Oilfields . . . and within the scope of his authority. This inference[2] does not necessarily apply to the defendant Phoenix . . . in this case as they did not own the truck involved in the accident, and the evidence has established that . . . Mason was an employee of Oilfields . . . Furthermore, you are not compelled to draw this inference, but you may do so if your reason and discretion so dictate; and if you draw such an inference, you are not required to abandon it in the face of any contradictory evidence, but must weigh the inference and such evidence as favors it against all contrary evidence to determine which, if either preponderates."

"If an agent or servant engages in a pursuit suggested solely by his own pleasure or convenience, or pursues some object which relates to an end or purpose which may be said to be the servant's individual and exclusive business, and while so engaged negligently commits a tort, the principal is not answerable, although he was using the principal's property,

[2]At plaintiff's request, an inference was defined to the jury as "a deduction which the reason of the jury draws from the facts proved. It must be founded on a fact or facts proved and be such a deduction from those facts 'as is warranted by a consideration of the usual propensities or passions of the person whose act is in question, the course of business, or the course of nature.' The word 'propensity' as used in this instruction means any 'natural or habitual inclination or tendency.' "

and although the injury could not have been caused without the facilities afforded to the servant by reason of his relations to the master.''

The court then continued with the following instructions, requested by plaintiff: ''An employee does not depart from course and scope of employment if at the time of the questionable act he is acting on behalf of his employer, even though at such time he may also be acting for his own private purposes.

''It is not necessary that a specific act, or failure to act, be authorized as such by the principal to bring it within the scope of the agent's authority. It is within the scope of his authority if it is done while the agent is engaged in the transaction of business which has been assigned to him for attention by his principal, or while the agent is doing any reasonable thing which his contract of employment expressly or impliedly authorizes him to do and which may reasonably be said to have been contemplated by that contract as necessarily or probably incidental to the employment.''

It thus appears that although the jury were not specifically and in so many words told, in accordance with Oilfields' requested instruction, that if they believed that Mason took the equipment out on the evening of the accident without the permission of Oilfields and for the purpose of operating it without such permission, then their verdict should be in favor of Oilfields and against plaintiff, nevertheless it was made clear to them that Oilfields was claiming that Mason had taken the equipment without permission, and, further, that if they found that Mason was negligent they must then decide whether he was acting as defendants' agent and within the scope of his authority as such agent at the time of the accident, and that defendants should be held liable if the jury found in the affirmative on the issues of agency and scope of authority. In addition, the court explained to them that if an agent or servant negligently commits a tort while pursuing only his own pleasure, convenience, or business, then the principal is not answerable. Under such circumstances, and in view of the fact that plaintiff's action is based solely on the theory of *respondeat superior* and not upon permissive use of defendants' equipment under the provisions of section 402 of the Vehicle Code, we conclude that the jury were adequately and fairly instructed and that no prejudice to defendants resulted from failure to elaborate in more detail on their defense of lack of permission.

█ Defendant Oilfields next urges that the court erred in telling the jury that if they found from the evidence that at the time of the accident Mason was driving Oilfields' vehicle and was an employe of Oilfields on that date then "you may infer from such evidence that said . . . Mason then was acting as the agent of said [Oilfields] . . . and within the scope of his authority," that although the jury were not "compelled to draw this inference," they could do so if their reason and discretion so dictated, and that if the jury drew "such an inference, you are not required to abandon it in the face of any contradictory evidence, but must weigh the inference and such evidence as favors it against all contrary evidence, thus to determine which, if either, preponderates." (See *Day* v. *General Petroleum Corp.* (1939), 32 Cal.App.2d 220, 227-232 [89 P.2d 718] ; *Shields* v. *Oxnard Harbor Dist.* (1941), 46 Cal.App.2d 477, 487 [116 P.2d 121].) Defendant's contention appears to be based on an assumption that the evidence on the issue of agency and scope of employment was without substantial conflict and wholly favored defendant (see *Day* v. *General Petroleum Corp.* (1939), *supra*), an assumption which, as discussed in more detail hereinabove, is not tenable, and also upon the argument that the criticized instruction in effect tells the jury that they may totally disregard such evidence as tends to favor defendant. It is clear, however, that the instruction did not tell the jury they were compelled to draw the inference and could ignore defendant's evidence, but merely that they were to weigh the inference against the other evidence in reaching their decision. The further statement, in the same instruction, that "the evidence has established that . . . Mason was an employee of Oilfields," would likewise appear not to have prejudiced defendant Oilfields, inasmuch as Mason's employment by Oilfields was not disputed and the basic issue was whether he was acting within the scope of that employment at the time of the accident.

### Size of Verdict

Defendants claim that the verdict, in the amount of $213,-460.22, is excessive and appears to have been influenced by passion or prejudice. Defendants' motion for a new trial, made on that ground, among others, was denied by the trial court. On appeal, without even attempting to summarize or discuss the evidence concerning the nature and extent of the injuries to plaintiff here, defendants argue that the verdict is excessive when compared with verdicts rendered in other cases in which other "severe" injuries were received.

As declared in *Crane* v. *Smith* (1943), 23 Cal.2d 288, 302 [144 P.2d 356], "The appellant's claim that the amount of damages awarded . . . is excessive, concerns an issue which is primarily factual in nature and is not therefore a matter which can be decided upon the basis of the awards made in other cases. . . . [D]amages are not excessive as a matter of law because a lesser amount has been deemed adequate compensation for a similar injury." (See also *Deevy* v. *Tassi* (1942), 21 Cal.2d 109, 120-121 [130 P.2d 389].)

Since defendants' claim of excessive damages is primarily factual in nature, they are required to set forth in their briefs all the material evidence on the point, and unless this is done their contention is deemed to be waived. A reviewing court starts with the presumption that the record contains evidence to sustain every finding of fact, and it is not the province of such a court to search the record in order to ascertain whether it contains evidence which will support a contention made by either party to an appeal. (*Tesseyman* v. *Fisher* (1952), 113 Cal.App.2d 404, 407 [248 P.2d 471]; *Kruckow* v. *Lesser* (1952), 111 Cal.App.2d 198, 200 [244 P.2d 19].) Despite the failure of defendants to fairly set forth or refer in their briefs to the evidence on the matters of plaintiff's injuries and the damages he suffered, we have with the assistance of plaintiff found evidence to the following effect in the voluminous record on appeal:

Plaintiff was 47 years of age at the time of the accident and his life expectancy was 23.08 years. He had been working for his then employer for some five years, and his monthly earnings were $410.41 after "taxes and all various items were deducted." Plaintiff testified that immediately after the accident he found himself lying on the ground, and "I discovered my right leg was badly shattered and that the pants leg was torn away from the shin bone, I guess you would call it, and I could see through it. The pain was great, it was almost unbearable." Plaintiff was taken in an ambulance to Kern General Hospital where an emergency amputation of his right leg at the upper third of the right femur, was performed. Because of gangrenous conditions a guillotine type (straight cut) of amputation was necessary, although usually deemed undesirable. Gangrenous conditions continued to develop, and three additional major surgeries on the stump became necessary. The bone and the sciatic nerve were cut back to the point where the medical experts concluded that nothing further should be done. Attempts were made to prepare plaintiff for an artificial leg or pylon, but in

the opinion of plaintiff's attending surgeon he will never be able to wear one because of the condition of the stump, although plaintiff had tried sincerely and earnestly to do so; plaintiff will have to continue to get around with a wheel chair and crutches. Plaintiff testified that he constantly suffers from phantom pains in his amputated right leg, which give the sensation that the leg is still there and subject to pains and also cause embarrassing quivering in the stump, which plaintiff cannot control; many nights he does not sleep at all because of the phantom pains, and his maximum amount of sleep any one night is four hours. His surgeon testified that phantom pains are actual sensations from which plaintiff will suffer the rest of his life, and that treatment of such pains "is not very satisfactory."

Besides amputation of his right leg, plaintiff sustained multiple fractures of the left leg, which were major and serious, and extended into the knee joint. This resulted in shortening of the leg about one-half to three-quarters of an inch and in permanent stiffness, instability, and restriction of motion and flexion. Plaintiff must wear a steel brace on his left leg for the rest of his life.

Within a week after plaintiff was hospitalized he developed a critically serious complication in the form of a blood clot which had originated in his injured left knee but which had lodged in his lungs. A specialist was called in, and plaintiff was given seven blood transfusions. Plaintiff also suffers from a ringing in the ears, which the medical experts consider to be a probably permanent condition and ascribe to the large quantity of drugs which it was necessary to administer to plaintiff during the eight and one-half months he was in the hospital. Plaintiff is also extremely irritable and nervous as the result of his injuries and necessary treatment.

Plaintiff's medical experts testified further that for the rest of his life he will need medical care, at a cost of approximately $300 a year, and will also require the services of a practical nurse, at a cost of some $200 a month.

Plaintiff's tabulation of his claimed items of damage shown at the trial may be summarized as follows:

| | | |
|---|---:|---:|
| Medical fees incurred | $ 4,649.75 | |
| Hospital | 6,041.94 | |
| Nurses (registered) | 2,147.00 | |
| Practical nurse | 550.62 | |
| Miscellaneous, such as ambulances, drugs, etc. | 372.92 | |
| Lost Wages, 19 months @ $410.41 | 7,797.79 | $ 21,560.02 |

| | | |
|---|---|---|
| Future medical expense, 23 years @ $300.00 | $ 6,900.00 | |
| Future nursing care, 23 years @ $2,100 ($175 a month) | 48,300.00 | |
| Future lost wages, 20 years @ $4,924.92 ($410.41 a month) | 98,498.40 | $153,698.40 |
| Total itemized damages | | $175,258.42 |
| Leaving for general damages covering suffering, pain and physical discomfort, past and future | | $ 38,201.60 |
| Amount of verdict | | $213,460.02 |

Defendants fail to furnish or point to any computation in the record stating the present value of plaintiff's future pecuniary damages, such as the annuity charts discussed in *Emery* v. *Southern Calif. Gas Co.* (1946), 72 Cal. App.2d 821 [165 P.2d 695]. Defendants argue, however, that excessiveness of the verdict is demonstrated when a reasonable rate of interest is computed upon the total award of $213,460.02, and mention that a return of 4 per cent on a total investment of that amount would yield something over $8,500 annually. In this argument they ignore the fact that plaintiff's past damages, as tabulated above, already total $21,560.02, a sum on which defendants do not suggest plaintiff should be allowed interest to the date of the judgment. They further do not take into consideration the facts that the computation of his wages, both past and future, is based on only the sum he was receiving after taxes and "all various items" were deducted, and that he would be obliged to pay taxes from any return upon invested moneys. Neither do defendants point to any evidence as to trends of compensation for medical and nursing care or for work of the kind which plaintiff was performing. Under such circumstances, we conclude that defendants have failed to sustain the burden of supporting their contention on appeal that the total verdict is excessive as a matter of law.

In affirming a judgment on a verdict which included some $73,000 in general damages, arising out of an accident in which the end of plaintiff's nose was cut off, it was declared (in *Johnston* v. *Long* (1947), 30 Cal.2d 54, 76 [181 P.2d 645]) that "The verdict is undoubtedly high. Nevertheless, it is not the function of a reviewing court to interfere with a jury's award of damages unless it is so grossly disproportionate to any reasonable limit of compensation warranted by the facts that it shocks the court's sense of justice and

raises a presumption that it was the result of passion and prejudice. [Citation.] The amount of the verdict must be viewed in the light of the evidence before the trial court. [Citation.] The trial court, in denying a motion for new trial, found that the verdict was not excessive. This decision lends weight to the jury's award. [Citations.] There is considerable support in the evidence for the trial court's approval of the amount awarded.'' (See also *Roedder* v. *Rowley* (1946), 28 Cal.2d 820, 822-823 [172 P.2d 353]; *Deevy* v. *Tassi* (1942), *supra*, 21 Cal.2d 109, 120-121; *Morgan* v. *Southern Pac. Co.* (1892), 95 Cal. 501, 508-509 [30 P. 601]; *Huggans* v. *Southern Pac. Co.* (1949), 92 Cal.App.2d 599, 615-616 [207 P.2d 864]; *Day* v. *General Petroleum Corp.* (1939), *supra*, 32 Cal.App.2d 220, 238-240.) In the present case we are likewise unable to hold that the evidence fails to support the verdict and the trial court's approval of it. Under such circumstances it is not within our province to interfere on appeal.

The judgment is affirmed.

Gibson, C. J., Shenk, J., Carter, J., and Traynor, J., concurred.

Appellants' petitions for a rehearing were denied May 18, 1955. Spence, J., was of the opinion that the petitions should be granted.