[Civ. No. 25284.   Second Dist., Div. Three.   May 18, 1962.]

ELOISE JANIS GARBER et al., Plaintiffs and Respondents, v. THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, Defendant and Appellant.

694

Schell & Delamer, Richard B. Goethals and Earle K. Stanton for Defendant and Appellant.

John T. La Follette for Plaintiffs and Respondents.

SHINN, P. J.—The present action is by the widow and children of Donald Eugene Garber against The Prudential Insurance Company of America for the wrongful death of Mr. Garber, who was drowned while preparing to take underwater photographs for the use of Prudential. The material facts alleged in the complaint are that Prudential, by its agents, engaged the services of Garber, who was inexperienced in underwater photography, to take underwater pictures for use in a company magazine published by Prudential; as an integral part of the engagement of Garber's services Prudential provided instruction, "made the arrangements for the taking of said underwater photographs in the Pacific Ocean . . . and that said defendant so negligently and carelessly failed to provide said decedent, Donald Eugene Garber, with adequate and necessary boats, life saving equipment and any other safety devices, so that as the proximate result of said negligence and carelessness of said defendant, the decedent, Donald Eugene Garber, was drowned at the time and place herein above mentioned." Defendant answered, denying negligence and alleging as separate defenses contributory negligence and unavoidable accident. The pretrial statement of the parties was made a part of the pretrial order wherein it was stated that plaintiffs contended defendant was negligent in failing to properly instruct Mr. Garber in the use of skin-diving equipment, in failing to select a safe place to skin dive and in failing to provide him with adequate instructions and safeguards. Defendant contended there was no negligence, no proof of proximate cause, and urged the defenses of contributory negligence and assumption of risk. Upon the first trial verdict and judgment were in favor of plaintiffs, but defendant's motion for a new trial was granted. Upon the second trial plaintiffs prevailed, and defendant has appealed from the judgment and from the order denying its motion for a judgment notwithstanding the verdict.

The grounds of appeal are (1) there was no evidence that Prudential, through any of its agents, acting within the scope of his or her authority, undertook to provide Mr. Garber with instruction or safety devices, or otherwise prepare him for underwater photography, and had no duty so to do; (2) no act

or omission upon defendant's part caused the death of Mr. Garber; (3) he was guilty of contributory negligence, and (4) with full knowledge of the danger involved in the undertaking he voluntarily assumed the risk.

There was no conflict in the evidence with respect to the material facts. Once a month defendant published a company magazine called "Scene" under the direction of Mr. William Peterson, Cordelia Elizabeth Gumpertz and Sally Curtiss. The activities of employees of the company were frequently featured in the magazine. Sally Curtiss, being informed that Harris Bakken and Andre Ward, who were parttime employees of Prudential, were accomplished skin divers, wrote a story which called for underwater photography. She learned from the young men that they were willing to participate in the project. They would be photographed using "scuba" (self-contained breathing apparatus). Knowing that Mr. Garber was an expert photographer whose services Prudential had contracted for from time to time, Sally Curtiss contacted him, explained what she wished and solicited his services. There was a meeting of Sally, Garber and Ward. It was discussed that Garber had had no scuba or skin-diving experience and had no equipment. Ward offered to obtain the necessary equipment. Previous to this meeting Ward had learned from Sally that Garber had had no experience in skindiving. The matter was discussed at the meeting. Garber asked whether Ward could teach him what he needed to know and Ward said that he could. Garber then met with Mrs. Gumpertz and Mr. Stewart, Peterson's superior, and, as Sally testified, they "went ahead and discussed financial arrangements and what would have to be done to get it all wrapped up and taken care of." It was arranged with Mr. Stewart that the company would pay $15 as rental of a watertight camera case. Peterson was advised of this and of the arrangement for Ward and Bakken to furnish the remainder of the equipment, which consisted of a skin-diving suit, a breathing tube, belt containing lead weights, face mask, aqualung and fins. All this equipment was provided through Ward and Bakken. Garber provided a camera and Prudential paid the rental of a watertight carrying case. Ward and Bakken took Garber to a heated swimming pool one evening, where they used the equipment for about an hour and a half. Garber's belt had 2 to 4 pounds of weight attached. The following day they went to the beach adjacent to Point Dume. They entered the water and swam for half or three quarters of an hour, using

breathing tubes known as snorkels. Garber was a good swimmer. Returning to the beach the boys put Garber into his equipment with the breathing tank weighing 30 or 35 pounds on his back and with 8 or 9 pounds of lead in the belt. They then entered the water. Bakken swam ahead. Ward accompanied Garber. When they reached a point which Ward estimated to be 200 yards or 200 feet offshore Garber appeared to be in trouble, and when this became apparent to Ward they headed towards shore. Ward noticed that Garber was experiencing difficulty and relieved him of the camera. Garber was taking water into the snorkel tube and finally lost the tube from his mouth. He did not release his belt or tank. Mrs. Garber, observing that her husband was in distress, rushed into the water and assisted Ward in bringing him to the beach. Attempts at resuscitation failed. Mrs. Garber sent the children up the cliff to summon help. Lifeguards arrived with lifesaving equipment, but their prolonged efforts to revive Garber were unsuccessful. It is not questioned that he met his death by drowning.

The skin-diving suit provided for Garber is known as a dry suit. It is skintight and drawn in at the neck, wrists and ankles to exclude water. There is always some leakage. It has no buoyancy. The suits used by Bakken and Ward are known as wet suits. They contain a layer of sponge rubber beneath the outer covering and are not watertight, but they are buoyant and will keep the wearer afloat. It is customary in scuba diving to use a belt containing lead weights, with a release which enables the wearer to release the belt instantly. The snorkel fits behind the head of the diver, attached to a face mask with a breathing tube held in the mouth. The tube is about a foot long, and when in use by a diver swimming just underneath the surface, about 4 inches of the tube extends above the surface of the water. The remainder of the breathing equipment consists of a tank and a bottle containing air under pressure; the diver switches to the tank when he descends to a depth that renders the snorkel unusable. The tank also has a quick-release mechanism. In order to make use of the tank and the snorkel in a proper manner the diver must keep the tank below or even with the surface, which necessitates his swimming just below the surface. Although it is comparatively neutral as to weight when fully submerged, the tank becomes dangerously heavy when the diver attempts to swim on the surface. Lead weights are used to facilitate reaching desired depths. Bakken and Ward with their wet

suits used 8 or 9 pounds of weight, and although Garber had a dry suit they put the same weight on the belt which they placed upon him.

The primary contention of defendant is that it assumed no duty to Garber, since none of its employees was acting within the scope of his or her authority in representing to Garber that Ward and Bakken would give him the instruction and the necessary preparation for use of the scuba equipment. The contention is, in final analysis, that Sally Curtiss had no authority to act in the unusual and unexpected situation that developed in the course of her work and that she exceeded her authority because she was not employed to furnish the facilities a photographer might need in order to take underwater pictures. The problem is not as simple as that.

Defendant argues that Garber was an independent contractor, and that it was his duty alone to prepare himself for the work he agreed to do. Plaintiffs do not deny that Garber was an independent contractor, but they maintain that defendant, by its agents, assumed a duty that otherwise would have rested upon him; this was a duty to provide equipment and training; Sally Curtiss and her superiors undertook to provide the equipment, some of it borrowed and some rented by Prudential; and Sally Curtiss, with the assistance of her subagents, Ward and Bakken, under her implied authority, undertook to provide the training.

In reviewing the verdict with respect to the matter of authority, we have to determine whether it was a reasonable inference that it was reasonably to be anticipated that Sally Curtiss, if confronted with the conditions that developed, would use the means that were at hand in order to accomplish the main purpose of her employment. Two juries and the judge in the second trial have answered this question in the affirmative. If we should believe that the conclusion reached by the jury in the second trial was one that would not be acceptable to reasonable minds we would have to hold it to be erroneous as a matter of law. If we should believe the question to be one upon which reasonable minds might differ we would have to consider ourselves bound by the verdict upon that issue, even though we might entertain an opinion different from that of the jury.

We must look first to the nature of Sally's duties. She was a staff writer for the magazine. She prepared an article on underwater diving, to be illustrated with pictures. The article

was approved by her superiors. The photographer she engaged for the pictures was not experienced in the use of scuba. The young men, Ward and Bakken, were experienced skin divers. They were approached by Sally and agreed to cooperate with her by posing for underwater photography and providing the necessary equipment for Garber. They also agreed to give him the necessary training. This was all arranged by Sally. There was no direct evidence whether Stewart or Peterson understood and consented to the arrangement for Garber to receive training from Ward and Bakken, but Sally testified that Garber discussed the plan with Stewart "to get it all wrapped up and taken care of," and it would have been natural for her to acquaint her superiors with the details of the arrangement. However, the question is not whether Sally had express authority from her superiors to go ahead with her plans, but whether she had authority incidental to performance of a duty expressly conferred.

When she was informed by Garber that he knew nothing about underwater diving she had already arranged with Ward and Bakken that they would cooperate in getting the pictures. They were available and willing to give Garber the training he needed and were competent to give it. What then was Sally expected to do under the circumstances? She could have called off her arrangement with Garber and endeavored to find a photographer who was experienced in underwater photography. She could have told Garber that he would have to go to a professional for his training. She could have given up the project altogether. It is plain to be seen now, in view of what happened, that she should not have trusted the young men to give Garber training in the use of the equipment, but the question is whether she acted under the conditions that had arisen in a manner that would reasonably have been expected of her in the performance of her duty to provide material for the magazine. Defendant has not told us what other course she should have taken or why she should have taken it, nor has it been pointed out wherein she acted unreasonably or wherein she turned aside from her duty. It is suggested that the young men were merely accommodating Garber in offering their services in obtaining the equipment and giving him the training. Clearly this was not so. Their participation was only a step in carrying out Sally's project for the use and benefit of Prudential. They had no interest in Garber other than to make use of his services. The fact that he might in the future benefit from the training was quite

apart from their intention to accomplish the purpose of Sally and her employer.

To say that Sally exceeded her authority is to say that with the means at hand to prepare Garber to furnish the pictures she needed she should not have made use of those means, however convenient they were and however adequate they appeared to be. Everything was working well for her and she had no reason to doubt that Garber would receive the necessary instruction in the use of the equipment, and that the project would be a success.

It was Sally's duty to provide articles of interest for the employees concerning their hobbies and activities. The idea of an article on diving with ''scuba'' or other underwater equipment was suggested to Sally when she learned that Ward and Bakken were skilled in the use of such equipment. It was a popular sport and a promising subject for an article that would be of interest to readers of the magazine. There were no defined limits to the authority of Sally in her efforts to unearth interesting material for her articles. She had no routine to follow. Each day might bring her into contact with conditions that had not been encountered before. There was no usual pattern for her activities. She had to meet conditions as they arose. She was not relieved of a duty to carry on her work every time she found herself in strange and unexpected conditions. She had authority to do what she was endeavoring to do, that is to say, to get an illustrated article for the magazine and to engage the services of Garber for that purpose. Everything she did was directed toward performance of a duty she owed her employer and exclusively for its benefit. It did not occur to Sally's superiors that she was exceeding her authority. No doubt, if everything had turned out as expected Sally would have been called a smart girl and would have received congratulations for the way she had managed to get things done with a minimum of expense to the company.

An agent has implied authority to use any means that are incidental to and reasonably proper in the performance of an assigned task. (*Vind* v. *Asamblea Apostolica etc. Christo Jesus,* 148 Cal.App.2d 597, 604 [307 P.2d 85] ; *Tarasco* v. *Moyers,* 81 Cal.App.2d 804, 810 [185 P.2d 86]; *Pacific Indem. Co.* v. *Industrial Acc. Com.,* 26 Cal.2d 509, 513 [159 P.2d 625]; *Bethlehem Steel Co.* v. *Industrial Acc. Com.,* 70 Cal.App.2d 382, 387-388 [161 P.2d 59] ; *Employers' etc. Corp.* v. *Industrial Acc. Com.,* 37 Cal.App.2d 567, 573-574 [99 P.2d

702

1089].)  ◼  "b. *Acts incidental to authorized acts.* An act may be incidental to an authorized act, although considered separately it is an entirely different kind of an act. To be incidental, however, it must be one which is subordinate to or pertinent to an act which the servant is employed to perform. It must be within the ultimate objective of the principal and an act which it is not unlikely that such a servant might do. The fact that a particular employer has no reason to expect the particular servant to perform the act is not conclusive." (Rest. 2d Agency, § 229, com. b, p. 508.)

◼  If an employee is not otherwise bound by specific instructions he may exercise his discretion as to the "time, place and manner of performing" his duties. (*Dauphine* v. *Industrial Acc. Com.,* 57 Cal.App.2d 949, 953 [135 P.2d 644].)

The above cases and others we shall mention are not cited as factual precedents for our holding. They merely state general rules, with respect to which there is no uncertainty.

The more cases that are examined the more clearly it appears that the facts to be considered can seldom be classified or patterned so as to have value as legal precedent. And it would be difficult to find a set of facts more odd and puzzling than those we have to consider. They present a factual situation the like of which has not been found in any previously decided case, and in all probability is unlikely to be duplicated hereafter. No case has been found in which any court has decided upon facts at all similar to those of our case that the question whether the acts of an agent were in excess of his authority was one of law.

If the principal acts of Sally Curtiss were within her authority she also had authority to appoint Ward and Bakken as her subagents, and in carrying out the purposes of the appointment they represented defendant in like manner as Sally did and to the same extent. (Civ. Code, §§ 2349, 2351.) If Prudential, through Sally Curtiss and her subagents, undertook to train the photographer, even though voluntarily, it had the duty to do so with reasonable care. (See *Johnston* v. *Orlando,* 131 Cal.App.2d 705, 709 [281 P.2d 357] ; *Valdez* v. *Taylor Automobile Co.,* 129 Cal.App.2d 810, 817 [278 P.2d 91].)

◼  The rule of incidental authority comes into play when in the performance of his duty the agent encounters conditions that are not usually met in the services he is employed to render. He does not lose his authority whenever he encounters unexpected conditions but may proceed in a manner that

appears to be reasonably appropriate. If this were not so, the responsibility would be that of the agent, alone, for any action taken under unusual conditions, even though the action was in the performance of his duty, and solely in the interests and for the benefit of his principal.

The most important question always is whether the agent was engaged strictly in an endeavor to bring about a result for which his services were engaged. If he was, the principal should not be permitted to escape responsibility upon the plea that his agent acted in some condition that arose which was out of the ordinary and unexpected.

We are persuaded that the evidence supports the conclusions of the triers of fact. We do not say the jurors could not reasonably have concluded that Sally exceeded her authority, but only that we believe the conclusion they reached was a reasonable one. A contrary conclusion would have amounted to denial of the authority of Sally to act in unusual and unexpected circumstances that confronted her in the performance of a task fully within her authority. Clearly the facts were not such as to compel that conclusion.

If there is support in the evidence for a reasonable inference that the act of the agent was within the scope of his authority, a finding of that fact will not be disturbed on appeal. (*De Rosier* v. *Crow,* 184 Cal.App.2d 476 [7 Cal.Rptr. 540]; *Leming* v. *Oilfields Trucking Co.,* 44 Cal.2d 343 [282 P.2d 23, 51 A.L.R.2d 107]; *Boynton* v. *McKales,* 139 Cal.App. 2d 777 [294 P.2d 733].) ''The question whether or not the act done is so different from the act authorized that it is not within the scope of the employment is decided by the court if the answer is clearly indicated; otherwise, it is decided by the jury.'' (Rest. 2d Agency, § 288, com. d, p. 505.)

When there is substantial evidence that an employee encountered unusual and unexpected conditions while acting strictly in the line of his duty, that he acted reasonably, in good faith, and with the sole purpose of advancing the interests of his employer in achieving a result which was the sole purpose of his employment, and that he did not violate his instructions, the question whether he exceeded his authority must be passed upon by the trial judge, or the jury under proper instructions, as one of fact. This is just such a case.

The crucial implied finding that Sally Curtiss possessed the authority to arrange for Garber's training was reviewed and approved by the trial judge upon the motions for a new trial and for judgment notwithstanding the verdict.

The trial was conducted with great care by the attorneys and the court. With respect to the questions whether the implied findings that Prudential, through its agents, assumed a duty to provide Garber with adequate training, and failed in that duty, were in accord with the preponderance of the evidence, we attach great weight to the judgment of the trial judge in ruling upon defendant's motions.

Although the factual conclusions of a jury carry no more weight than those of trial judges, the fact should not be overlooked that two juries have found that Sally Curtiss acted within her implied authority.

The most that can be said in criticism of Sally's actions is that she was overzealous in the interests of her employer. That a tragedy occurred, instead of the success she anticipated, would be a poor reason for repudiating her actions.

The next question is whether Prudential's agents were guilty of negligence. It is clear that they were. Without giving Garber any training whatever in the use of the equipment under conditions he would encounter in the ocean, they permitted him to put on all the gear, including 8 or 9 pounds of lead, and to swim so far away from shore that he became exhausted and was unable to return.

Rimmon Fay, an expert and instructor in scuba, with years of underwater experience, testified for plaintiffs. He was familiar with books on safety procedures and customs in scuba, and was also familiar with accepted local customs and practices. Robert M. Burnside also testified for plaintiffs as an expert. He had extensive experience as a lifeguard, in scuba diving and in teaching the subject. These two witnesses testified at length, and were in agreement as to the essentials of preparation for underwater work; the most important safety measure is a float of some sort to grasp if you get into trouble; an inner tube would suffice; if you use a wet suit it is necessary to put on weights; if you drop the weights the suit will keep you up; it is highly important that you should not be overweighted; if you are overweighted and in a dry suit the possibility of drowning is very great, but this is not true if you are in a wet suit; it is important for the diver to determine the weight he should put on after testing his buoyancy in his suit; this must be done in the water; it cannot be done on dry land. In the water, weights should be added until the person can sink or float at will. A requirement of the utmost importance is complete familiarity with the equipment under working conditions, so that the user will know what the equipment is

going to do and how it is going to do it; that knowledge could not be obtained in an hour and a half in a heated pool; one should have had quite a little experience in the ocean before attempting to swim in a suit with weights on; he should get into the water and familiarize himself with the safety releases; he should practice the use of the equipment in shallow water. Any roughness of the surface of the ocean is likely to cause water to enter the snorkel tube; one has to learn how to expel it without allowing it to enter the lungs. Burnside summarized his views with the statement that people who enter the water with underwater equipment, and without sufficient instruction and practice, are usually picked up by the lifeguards the following day. Both Ward and Bakken were shown to be familiar with the customary safety measures, including adequate training.

It is clear that Mr. Garber was wholly unprepared to engage in scuba diving. Without repeating the essentials of training and preparation, it is sufficient to say that they were sadly neglected. It was clearly established that Garber's inability to use the equipment successfully was attributable only to his lack of training. The failure of his instructors to give him that training was a negligent breach of the duty they had assumed.

Defendant's further contention that Mr. Garber voluntarily assumed the risk cannot be sustained. Counsel, of course, are well aware of the rule stated in *Bilyeu* v. *Standard Freight Lines*, 182 Cal.App.2d 536 [6 Cal.Rptr. 65] and *Hayes* v. *Richfield Oil Corp.*, 38 Cal.2d 375 [240 P.2d 580], that before one can be held to have assumed the risk of danger of an undertaking it must be shown that he had knowledge and appreciation of the danger. Defendant says it is common knowledge that swimming in deep water involves danger, and that people who take to the water voluntarily assume that risk, but this is not so simple a case. The danger that Garber faced was not merely in going for a swim, but in undertaking to swim loaded with equipment he had never used before and which could only be safely used by those who understood it and were trained to make proper use of it. Essential facts upon which the case of plaintiffs depends are that Garber had not been informed and did not know of the danger he was facing in swimming far from shore, carrying strange and heavy equipment, the use of which required knowledge and skill which he did not possess. When Ward and Bakken believed he was sufficiently trained Garber had

no reason to believe otherwise. It is not logical to contend that he should have known of the danger when Ward and Bakken believed there was none. There is clearly no merit in the defense of assumption of risk.

It is urged by defendant that Garber was guilty of contributory negligence in undertaking to swim with scuba when he knew he had insufficient training. There would have been substance to this argument if Garber had had no training whatever, but the defense is unavailing in view of the fact he had received instruction from acknowledged experts and the training which they deemed to be sufficient. It was understood that Ward would stay with Garber; Bakken testified they believed Garber would be safe because he would be under their protection. The ocean was smooth, nothing hazardous was to be undertaken, and no difficulty was anticipated. Clearly the question of contributory negligence was for the jury.

The judgment and order are affirmed.

Ford, J., concurred.

FILES, J., Dissenting.—With some regret I must dissent because I cannot find in the record the evidence which would support the judgment. Although there is more than one ground for reversal, these remarks are directed to the single issue of whether defendant had any duty to provide for the safety of the decedent. This turns on the question of agency to contract. The individuals whose alleged deliction caused the death were not sued, and hence the agency question could dispose of the entire case.

There can be no doubt that the deceased was, as to the defendant, an independent contractor. He agreed to supply a picture for a price. Were there no other relationship, defendant would have had no duty to train and equip the deceased, and therefore could not be charged with negligence for any alleged failure in this respect. However, plaintiffs contend that defendant, acting through its agents and employees, agreed to equip and train the deceased for underwater photography, and to select a safe place in which to dive, and that defendant was negligent in the performance of these extra duties which it had voluntarily assumed.

If defendant did not make any contract to train the deceased and provide for his safety, then defendant could not be liable for not having done so. This is not a case in which

defendant's employees inflicted physical harm upon the deceased. The alleged tort is the failure to perform adequately certain alleged duties which would not have existed unless the defendant and its employees had agreed to assume such duties. The basic question then is whether there is any evidence that defendant authorized that contract to be made on its behalf. The burden of proof was on plaintiffs to prove that defendant authorized such an agreement, and unless some such evidence is produced defendant is entitled to a directed verdict. (*Perkins* v. *Pacific Fruit Exchange,* 132 Cal.App. 278 [22 P.2d 535]; *Peterkin* v. *Randolph Marketing Co.,* 48 Cal.App. 300 [191 P. 947].) Agency to bind the principal to a contract must rest upon what the principal actually intends or appears to intend. (Civ. Code, §§ 2299, 2315, 2316, 2319; Rest. 2d Agency, §§ 32, 33.)

In arguing that Miss Curtiss was acting within the scope of her authority, the majority opinion has cited *Vind* v. *Asamblea Apostolica etc. Christo Jesus,* 148 Cal.App.2d 597 [307 P.2d 85]; *Tarasco* v. *Moyers,* 81 Cal.App.2d 804 [185 P.2d 86]; *De Rosier* v. *Crow,* 184 Cal.App.2d 476; *Leming* v. *Oilfields Trucking Co.,* 44 Cal.2d 343 [282 P.2d 23, 51 A.L.R. 2d 107]; *Boynton* v. *McKales,* 139 Cal.App.2d 777 [294 P.2d 733]; and Restatement Second of Agency, section 228, comment d, and section 229, comment b. These authorities all deal with the question of when a servant is within the scope of his *employment* so that his torts are chargeable against the master. Scope of employment, creating tort liability in a master, should not be confused with scope of authority to make a contract binding on a principal. A truck driver may be within the scope of his employment under the cases above cited but still have no authority to agree that his employer will train and equip an underwater photographer.

In this case there is evidence that the two office boys, Ward and Bakken, and the staff writer, Miss Curtiss, were at all times employees of defendant and were doing some acts within the scope of their employment. Thus, it may be assumed, if Miss Curtiss or one of the boys had driven his automobile negligently en route to Point Dume, defendant might have been held liable for any resulting injury to a third person. (*Boynton* v. *McKales,* 139 Cal.App.2d 777 [294 P.2d 733].) It may further be assumed that if one of the boys, while posing for a photograph, had negligently struck the photographer with a fish spear, defendant, as employer of the boy,

might have been liable for that injury. But this sheds no light on the question which is at the heart of plaintiffs' case —that is, whether any of these individuals had authority to agree that Prudential Insurance Company would equip and train Mr. Garber for underwater photography and select a safe place in which to work.

Workmen's compensation cases dealing with "scope of employment" are likewise of no assistance here, because the scope of compensation coverage is determined by standards entirely different from the standards which measure the scope of authority to contract. We may assume that Miss Curtiss was at all times physically within the scope of her employment, so that she would have been compensated for any injury to herself, but this does not help to decide whether she was empowered to put her employer into the business of training underwater photographers.

It is clear enough that no individual here involved had unlimited powers, or even general powers of management, over any aspect of defendant's business. There is evidence that Miss Curtiss had some authority to engage a photographer at rates which had been previously established, and presumably the company was bound to pay for the pictures she ordered. There is no suggestion that defendant held out any individual as having more authority than he actually had, and thus the problem of ostensible agency does not arise. The question then comes down to whether there is evidence that one of these individuals was authorized to make the kind of contract with the photographer which plaintiffs claim was made.

An agent has authority "To do everything necessary or proper and usual, in the ordinary course of business, for effecting the purpose of his agency." (Civ. Code, § 2319.) To some extent the question of what is "in the ordinary course of business" is one for the jury to decide by drawing inferences from the facts in evidence, but the jury is not entitled to find authority when there is no evidence that the principal either intended the act to be done or manifested any such intent. Thus, for example, an agent authorized to accept fruit on consignment for sale was not authorized to guarantee that the consignor will receive a certain price (*Perkins* v. *Pacific Fruit Exchange,* 132 Cal.App.278 [22 P.2d 535]) ; an agent authorized to draw checks was held not authorized to create an overdraft (*Torrance Nat. Bank* v. *Enesco Fed. Credit Union,* 134 Cal.App.2d 316 [285 P.2d 737]) ; a baggage

man employed by a railroad was held not to have authority to invite a motorist to cross the tracks at the company's risk (*Reger* v. *Southern Pac. Co.*, 59 Cal.App. 313 [210 P. 971]) ; an agent authorized to collect money had no authority to accept the debtor's property in payment (*Taylor* v. *Robinson*, 14 Cal. 396). For further discussion of the limitations upon what is "necessary or proper and usual, in the ordinary course of business, for effecting the purpose of his agency," see *Howard* v. *Winton Co.*, 199 Cal. 374 [249 P. 511, 47 A.L.R. 1012] ; *Acme Gravel Co.* v. *Bryant*, 111 Cal.App. 411 [295 P. 209] ; *Zellerbach Paper Co.* v. *Virden Packing Co.*, 10 Cal. App.2d 635, 642 [53 P.2d 163, 54 P.2d 18] ; *Gallagher* v. *California etc. Co.*, 13 Cal.App.2d 482, 489-492 [57 P.2d 195].

It should be noted that an intention to benefit the principal is not enough to establish agency to make a contract. In many of the cited cases the agent apparently intended to further his principal's business, and under some circumstances the transaction might have been beneficial.

The evidence relating to the relationship between defendant and its employees and the deceased contains no material conflicts. Miss Curtiss was a staff writer for the house magazine. Bakken and Ward were 17-year-old high-school students who worked four hours each afternoon in the machine accounting department. The boys did not receive pay either for the Friday night coaching session or the Saturday trip.

The deceased was an independent businessman who made his living as a commercial photographer, serving many clients. He was one of several photographers with whom defendant dealt from time to time. Photographers understood that defendant paid certain rates for photographs, per shot and per print, plus mileage. These prices were subject to negotiation in particular situations. The photographer ordinarily furnished his own equipment.

Miss Curtiss and her editors wanted an underwater photograph for the cover, and preferred that it be a picture of an employee rather than a stock shot, if practicable. She called Mr. Garber, with whom she had worked in the past, and inquired if he was interested. In a second conversation he said he was interested. Garber said he had never done this kind of diving and had no equipment. He came to Miss Curtiss' office and met Ward and discussed the assignment. One purpose of the meeting was to talk to the boys about equipment. Mr. Garber asked where he could get it or rent

it, and Ward offered to obtain some by borrowing from friends who were members of a skin-diving club to which Ward and Bakken belonged. Later in the week Garber telephoned Ward directly to make arrangements for borrowing the equipment. Garber asked Ward if he could teach him what he needed to know. The boys suggested that they go to the swimming pool at the Chase·Hotel in Santa Monica on Friday evening for practice.

On Friday, Ward and Bakken drove to work in Bakken's car. They carried the borrowed diving equipment in the car. After work Garber met them and the equipment was transferred to his car. The three of them then drove to a shop where Garber obtained the underwater camera case (for which defendant had agreed to reimburse him in the amount of 15 dollars). They went to dinner and afterwards to the Chase Hotel, arriving about 8 p.m., where Garber practiced swimming underwater with the equipment. About 9:30 the pool closed and Garber drove the boys back to their car near the Prudential office.

Garber, Ward, Bakken and Miss Curtiss all came to Point Dume on Saturday morning. Miss Curtiss' function was to work with the photographer and tell him what pictures were wanted. There is no evidence as to what she told him about this, other than the initial suggestion that an underwater photograph was desired.

The argument is made that Miss Curtiss had ''implied authority'' to agree to equip and train Garber for diving and select a safe place for him because this was necessary to the employer's business. The ''implied authority'' of an agent is no more than what the principal himself actually intended the agent to do under the circumstances. The implied authority of an agent, as defined in Civil Code, section 2319, is limited to what is necessary, or proper and usual in the ordinary course of business. None of these elements appears in the evidence. The evidence does not show that it was necessary to deal with Garber in order to obtain a satisfactory picture, or even that it was important to have an underwater picture. No one has had the temerity to suggest that it is ''usual'' to agree to equip and train a wholly inexperienced person in order to buy an underwater picture. There is nothing in the evidence to indicate that under any circumstances the management of the Prudential Insurance Company ever would have voluntarily assumed the grave responsibility for equipping

and training an underwater photographer and providing for his safety.

There is not the slightest suggestion that it was necessary to deal with Garber at all, except for his desire to gain experience and Miss Curtiss' personal willingness to accommodate him. The evidence shows that before Miss Curtiss interviewed Garber, the defendant had not definitely decided to use an underwater photograph, or if it used one, whether it would be a specially posed picture or a stock shot which could be purchased elsewhere. The article on skin diving was not even necessary to carry out the defendant's business purpose, for the evidence shows that the staff had an alternate story ready for use in the event that the diving article was not completed. Even if the particular photograph be regarded as "necessary," there is no evidence that it was necessary, or even advantageous, to select a wholly inexperienced man and then make a contract to train and equip him for the job. Garber was only one of many photographers who did business with defendant, but Miss Curtiss did not call upon any other because Garber said he wanted the experience. The evidence does not show how many qualified underwater photographers are available in the Los Angeles area. All of the evidence compels the conclusion that Garber wanted to try something new, and that Miss Curtiss and the two office boys agreed to help him, not for Prudential, but for Garber.

The evidence in the record contains nothing from which could be drawn a reasonable inference that defendant authorized any of its personnel to undertake an obligation on its behalf to furnish proper equipment, to train Mr. Garber to a reasonable degree of proficiency in underwater photography, or to take any responsibility for his personal safety. To say that the jury might infer such authority from the circumstances would be only to say that a jury of twelve laymen may apply its own standards as to the legal effect of the facts in evidence.

The judgment should be reversed.

A petition for a rehearing was denied June 13, 1962. Files, J., was of the opinion that the petition should be granted. Appellant's petition for a hearing by the Supreme Court was denied July 11, 1962.